### Robert F. NEUGEBAUER

v.

**The A. S. ABELL COMPANY, William Schmick, Jr., President, J. Stephen Becker, Vice-President and Business Manager, B. Herbert Reynolds, Circulation Director and Arthur A. Knapp, Supervisor and Manager of Home Delivery, Robert H. Cavanaugh, Director of Marketing, James Kotan, Representative, John Brockmeyer, District Advisor.**

Civ. No. Y-75-776.

United States District Court,
D. Maryland.

June 25, 1979.

Arnold Fleischmann, John A. Austin, and Charles E. Rosolio, Towson, Md., for plaintiff.

Edmund P. Dandridge, Jr., and J. Frederick Motz, and Richard L. Wasserman, Baltimore, Md., for defendants.

JOSEPH H. YOUNG, District Judge.

The plaintiff, Robert F. Neugebauer, has been an authorized carrier for the delivery of newspapers published by the defendant, the A. S. Abell Company, ("Abell"), under the direction of the named defendants. Abell publishes three newspapers, the Morning Sun, Evening Sun, and Sunday Sun ("Sunpapers") which have over ninety percent of their circulation in the Baltimore Standard Metropolitan Statistical Area ("SMSA") consisting of Baltimore City and Anne Arundel, Baltimore, Carroll, Harford and Howard counties. This more "urban" area of the Sunpapers' market is known as the Primary Market Area ("PMA"). Since November 8, 1956, plaintiff has been an authorized carrier, having purchased his delivery business, known as "Route 155" with defendants' approval and consent. In purchasing the route, plaintiff obtained the right to buy Sunpapers from the defendants and, in turn, sell them to customers located in a designated territory known as the area of "primary responsibility."

By an amended complaint in six counts,[1] plaintiff charged defendants with various antitrust violations in their dealings with him. The principal allegation is that defendants have acted to "squeeze" plaintiff out of the home delivery business by increasing the wholesale price charged for their newspapers. Since defendants also sell their newspapers directly in the retail market themselves through vending machines on the street and through their own direct delivery service, plaintiff claims that defendants' raising of the wholesale price has reduced his profits so as to drive him out of the home delivery business.

The case was tried before a jury for four days, and after some eight hours of deliberations, the jury was unable to agree upon a verdict. Prior to sending the case to the jury, the Court had denied defendants' motions for directed verdicts. Defendants have now renewed these motions by filing a Motion for Verdict under Rule 50(b) of the Federal Rules of Civil Procedure. After reviewing the evidence in this case, including the trial transcript, this Court will grant defendants' motion for a directed verdict and enter judgment accordingly.

## I. THE FACTS

Since purchasing the delivery route, plaintiff has been continually involved in the servicing of his contract area, an operation which he claims is a full-time, seven-day-a-week business and which involves the assistance of his wife and some part-time employees in collecting the subscription price, sending out bills, and maintaining seven-day answering services. Plaintiff's difficulties began around May 8, 1968 when defendant Abell raised its wholesale rate for the newspapers sold to him. Five days later, plaintiff raised the retail price to his contract area's customers. By raising his prices, plaintiff was then charging his customers a rate in excess of Abell's suggested home delivery price, presumably to maintain his previous profit margin. This pattern continued for each increase of Abell's wholesale price thereafter.

Plaintiff alleges that in October, 1968, Abell began to retaliate for his failure to abide by the suggested prices and initiated a direct delivery solicitation of customers in Neugebauer's contract area to persuade plaintiff's customers to terminate their delivery service with him and enter into a cheaper direct subscription agreement with Abell. This solicitation period for direct delivery service continued until 1972. Plaintiff claims that Abell's solicitors informed his customers that the same delivery service was directly available from the Sunpapers at a lower subscription price.

Since Abell operates its direct delivery service at a loss, plaintiff suggests the only motivation for commencing the solicitation and direct delivery system was to retaliate

---

1. The six counts are (1) price fixing and monopolization, 15 U.S.C. § 1, (2) end use restrictions, 15 U.S.C. § 1, (3) exclusive dealing, 15 U.S.C. § 14, (4) price discrimination, 15 U.S.C. § 13a, (5) monopolization, 15 U.S.C. § 2, and (6) violations of the Maryland Antitrust Laws, Md. Com.L.Code Ann. § 11–204(a) & (b). By Memorandum and Order dated April 5, 1978, this Court granted defendants' motion for summary judgment as to counts 1 and 4 only.

for plaintiff's unilateral price decisions and to coerce him into abiding by Abell's suggested rates. Thus, plaintiff faced the problem of being caught in a "price squeeze" since Abell set both the retail price charged to consumers as well as the wholesale price charged to carriers such as Neugebauer. If Neugebauer had to pay more for his newspapers at wholesale and could not pass on the price increase because of Abell's upper limit on the retail prices, then obviously he had to absorb the difference through decreased profits. Plaintiff alleges that the harm caused by Abell's price squeeze continues even now and serves to allow Abell to coerce plaintiff and other authorized carriers to adhere to Abell's suggested retail prices and to permit Abell to attempt to monopolize the newspaper retail market. Plaintiff submits that since Abell had no appropriate or substantial business reason for establishing the direct home delivery system, its activities were motivated by the misuse of its monopoly power in the PMA. He also asserts that defendants were in part motivated to take these actions against him because of his position in the Carriers Council, a group of independent newspaper carriers within the Sunpapers' Route Owners' Association, and as Chairman of the Maryland Independent Newspaper Distributors Association.

Defendants have responded arguing that they have never attempted to subject plaintiff to a price squeeze, and that they lack the requisite monopoly power to effectuate the practices of which plaintiff complains. Plaintiff's theory amounts to an allegation that by virtue of its ability to control retail and wholesale prices, Abell is creating a price squeeze which has the effect of eliminating the wholesale market entirely.

Abell admits that plaintiff is an authorized carrier under contract to deliver Sunpapers to homes in a designated area of the Linthicum section of Anne Arundel County, an area within the PMA. When plaintiff entered into his present contract with Abell in 1972, Abell was using its own employees to deliver Sunpapers to some home subscribers in plaintiff's area. Abell has apparently continued the delivery service but does not solicit for it and has undertaken direct delivery service to new subscribers only at their specific request.

While Abell acknowledges its decision to raise its wholesale prices in May, 1968, it claims that the subsequent solicitation program has been mischaracterized by plaintiff. Toward the end of July, 1968, Abell, at its own expense, sent solicitors into plaintiff's area to make a door-to-door solicitation for subscriptions; however, Abell conducted this campaign at plaintiff's then-prevailing rates and turned over any new subscriptions to him. Transcript at 320–21. Three months later, faced with a serious decline in subscriptions, Abell decided to try to expand its circulation on a limited basis by soliciting in areas adjacent to those served by the independent authorized carriers. Abell offered these subscriptions at its then-prevailing suggested home delivery prices in areas where it already had responsibility for home deliveries. People hired as solicitors received explicit instructions to be followed *"without any deviation"* and were told by Arthur Rode, the person in charge of solicitations in Baltimore City, that they were not to be competing with the independent carriers:

> I want to stress that you are not to make any attempt to take present subscribers away from the carrier. However, in the event the customer voluntarily expresses her dissatisfaction over her present service or price, we can then offer our services and prices direct to her from The Sunpapers.

Instructions for Solicitors from Arthur Rode (emphasis in original). *See also* Rode Affidavit of October 25, 1977. The record further indicates that when one of Abell's solicitors ignored these instructions, he was promptly dismissed from service.

## II. PLAINTIFF'S THEORY OF THE CASE

Given Abell's direct delivery solicitation program, plaintiff concludes that Abell has acted so as to ensure itself a monopoly in the relevant newspaper *wholesale* market. Since Abell is the sole distributor of Sunpa-

pers in the Baltimore Metropolitan Area, it constitutes plaintiff's sole source of supply. Plaintiff's theory about monopolization in the newspaper wholesale market is premised upon his claim that each of the separate Sunpapers editions (Morning, Evening, and Sunday) constitutes a unique product for which there is no substitute in the Baltimore market. In other words, Abell controls a one-brand market which has no effective substitute or competition. According to plaintiff, Baltimore's News American, an afternoon newspaper, appeals to a substantially different customer and is not a substitute for the Sunpapers.

Plaintiff also advances the novel theory of the Sunpapers competing directly with itself by selling at one price to the wholesale buyer (Neugebauer) and at another, higher, price to the retail buyer (the consumer).[2] Increasing the wholesale price effectively reduces an independent carrier's profit by reducing the overall spread between wholesale and retail prices. By making plaintiff's activities uneconomical, Abell can then effectively terminate his wholesale activities and have the retail market all to itself.

As the case went to trial, two main issues were to be presented to the jury: (1) whether the defendants were guilty of monopolizing the newspaper wholesale market in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and (2) what that market consisted of. In order to make these determinations, the Court must first consider the nature of the market which plaintiff is claiming defendants monopolized.

## III. RELEVANT MARKET

### A. Proving a product market

To prevail in a claim of attempted monopolization, plaintiff must demonstrate that the defendant committed acts with specific intent to monopolize trade in the relevant market, and that there is a dangerous probability that the defendant will succeed in its attempt to monopolize the relevant market. *Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905); *American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

Plaintiff contends that for the purposes of determining whether Abell has violated the anti-monopoly provisions of 15 U.S.C. § 2, the relevant market must be narrowly construed to include *only* the Sunpapers rather than some broader market which might include other newspapers regularly available in the SMSA such as the Washington Post, the News American, the Washington Star, the Annapolis Capital, and numerous community newspapers, as well as broadcast media like radio and television. Obviously, the narrower the market, the easier it is to show "possession of monopoly power in the relevant market." *United States v. Grinnell Corp.*, 384 U.S. 563, 570, 86 S.Ct. 1698, 1699, 16 L.Ed.2d 778 (1966).

According to plaintiff, there are several reasons for considering the Sunpapers alone to constitute the relevant product market. First, and somewhat obviously, no one other than Abell can supply the Sunpapers. Second, there are no other major newspapers which adult independent carriers can deliver in the Baltimore Metropolitan Area.[3] Third, plaintiff claims that his con-

---

**2.** In the Memorandum accompanying his Motion for Summary Judgment, at 19, plaintiff argued as follows:

Abell, a monopolist in the newspaper wholesale market in the Baltimore Metropolitan Area, in competing with plaintiff for customers on his route, has in effect sold newspapers to itself at the retail level of distribution and by virtue of its monopoly power at the wholesale level, has made it impossible for plaintiff to compete with the price charged by Abell through its direct delivery system.

Plaintiff raised the same point again in his Trial Memorandum at 18. As will be explained below, this argument makes sense only on the assumption that Abell can be found to have a "natural monopoly" of its own products in violation of the antitrust laws.

**3.** The News American employs a different delivery system which primarily utilizes young boys and girls, known as "Little Merchants," who provide independent delivery services. Some adult carriers, however, are also used. Transcript at 246, 366.

tract with Abell effectively prevents him from delivering other papers on his route. Finally, Abell publishes the only morning newspaper available for home delivery in the Baltimore Metropolitan Area. Thus, plaintiff's relevant market contentions relate to both the nature of the products sold and the area in which they are sold.

Relevant market is defined in terms of product and geography.[4] *United States v. E. I. duPont de Nemours,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (hereinafter cited as the *Cellophane* case). Defining a given product market requires that the definition be broad enough to include all substitutes yet narrow enough to exclude nonsubstitutes. The concept of substitutability requires an assessment of consumer use of the product in order to determine what other products are price sensitive to changes in the price of the original product so as to constitute interchangeable goods for the original product. The presence of substitutes within a given product market can have the effect of constraining monopoly pricing, since a monopolist's attempt to raise his price above a competitive level will, given substitution, prompt competitors already in the market or facing low entry barriers to begin underselling the monopolist. An economist assesses substitution by measuring the cross-elasticity of demand for a given product within the trade, and the cross-elasticity of demand may be defined as "the percentage change in the quantity demanded of a product resulting from a small percentage change in the price of the product." R. A. Posner, Antitrust 437 (1974). *See also* C. E. Ferguson, Microeconomic Theory 106–08 (3d ed. 1972).

For example, if the price of a morning newspaper increased slightly and resulted in a large increase in consumer demand for afternoon or evening papers (or even a morning newspaper from a different publisher) the latter would constitute substitutes for the former, and the presence of interchangeability would demonstrate elas-

tic demand. Conversely, if the newspapers were poor substitutes for each other, a small price rise in one would have little if any impact on demand for the other. The concept of cross-elasticity of demand relates to the ability to use monopoly pricing as follows:

The higher the cross-elasticity of demand between two products, the less will be the ability of a sole seller of one of the products to raise his price without suffering a reduction in sales volume so great as to offset the positive effect of the higher on profits.

R. A. Posner, *supra,* at 438.

The *Cellophane* Court expressly sanctioned this cross-elasticity of demand analysis, recognizing that its application was necessary in order to determine if there had been monopolization:

Illegal power must be appraised in terms of the competitive market for the product.

Determination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another.

351 U.S. at 393, 76 S.Ct. at 1006. In addressing the relevant market aspects of the case, the Court reasoned as follows:

When a product is controlled by one interest, without substitutes available in the market, there is monopoly power.

. . .

\*     \*     \*     \*     \*     \*

But where there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others. If it were not so, only physically identical products would be part of the market. . . . What is called for is an appraisal of the "cross-elasticity" of demand in the trade. . . . The varying circum-

---

4. The parties have agreed that the relevant geographical market is the PMA, or the Baltimore Metropolitan area.

stances of each case determine the result. In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that "part of the trade or commerce", monopolization of which may be illegal.

351 U.S. at 394–95, 76 S.Ct. at 1006–7.

Defining cross-elasticity of demand may be theoretically simple, however actually measuring it in a particular market presents certain practical difficulties. As a result, courts have wisely followed the Supreme Court's lead in recognizing the availability of certain "proxies" which may be indicative of the contours of a specific "market." Noting that the tests to be applied remain constant although the individual market being studied may vary, the *Cellophane* Court proposed that a market would be "composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." 351 U.S. at 404, 76 S.Ct. at 1612.

The Supreme Court's subsequent application of the *Cellophane* test has emphasized the relevance of use and qualities rather than price elasticity[5] and has developed into a functional interchangeability test eschewing the inconclusiveness of microeconomic data for the more practical but perhaps subjective standard of use and qualities. In *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), the Court rejected defendants' arguments that burglar alarm services were not interchangeable with fire alarm services and therefore could not be included in the same market of central station protection services. The Court, after looking at the use for which the various devices were intended, concluded that:

> there is here a single use, i. e., the protection of property, through a central station that receives signals. It is that service, accredited, that is unique and that

competes with all the other forms of property protection. We see no barrier to combining in a single market a number of different products or services where the combination reflects *commercial realities*. To repeat, there is here a single basic service—the protection of property through use of a central service station—that must be compared with all other forms of property protection.

384 U.S. at 572, 86 S.Ct. at 1704 (emphasis added).

### B. Plaintiff's natural monopoly theory

At trial, plaintiff attempted to prove that the relevant product market was the wholesale newspaper market in the PMA. In advancing this argument, plaintiff suggested, however, that the monopolization was occurring at the *retail* level. *See* Plaintiff's Trial Memorandum at 7–9. Presumably plaintiff means that by squeezing out plaintiff from the wholesale market, Abell can somehow further its attempt to monopolize the retail market. Yet this explanation makes no sense at all since, as a matter of law, defendant Abell would, under certain conditions, be perfectly capable of eliminating plaintiff altogether without a "squeeze" and without any antitrust liability. As will be explained below, Abell could do this directly by unilaterally ending its independent carriers program in order to conduct all home deliveries itself. In advancing his theory even further, plaintiff tries to show that the Sunpapers is a one-brand market, however, insofar as plaintiff contends that Abell constitutes the scope of the relevant market because it is the sole source of Sunpapers, plaintiff has merely stated the obvious while proving nothing.

Conceivably, plaintiff could show that consumers' preferences and willingness to buy a product regardless of how high its costs may create such an inelastic product that it is a one-brand market, i. e., one with no substitution. To demonstrate this, however, plaintiff would have the Court believe that Abell faces no competition whatsoever

---

**5.** Reliance on price elasticity has been discussed in E. Gellhorn, Antitrust Law and Economics 123–25 (1976) and R. A. Posner, *supra*, at 438–41.

from the News American and three other daily papers, a large number of weekly community papers, four television stations and several radio stations. *See* Transcript at 119A–20 (admission of such multimedia competition by plaintiff's expert witness). Each type of media is in the business of disseminating news to the general public, and from the "commercial realities" standard of *Grinnell, supra,* it would be exceedingly myopic to conclude that the Sunpapers and, say, the News American or perhaps even the Washington Post, are not basically fulfilling similar functions and are to some degree price sensitive in the Baltimore area.

The essential fallacy in plaintiff's argument, however, lies in his attempting to define the relevant product market not on the basis of commercial realities such as use and quality of the item but rather on the basis of the distribution system utilized by Abell. If accepted, the logic of plaintiff's argument would mean that the definition of the product market would turn on *how* defendant Abell distributed its product rather than on the nature of what was being distributed.[6] Additionally, plaintiff's theory would premise liability on the presence of two types of alleged monopoly, with monopoly again being defined in terms of the product distribution system. The first monopoly is that which defendant has over its own product when sold at wholesale. The second monopoly, one which plaintiff has failed to prove, is that acquired in competing with other products in the relevant market. Obviously, by definition, no one competes with Abell at wholesale: plaintiff can purchase Sunpapers for resale only from Abell because no one else makes them.

Yet this type of "monopoly" is clearly not the sort forbidden by the antitrust laws.

This conclusion follows directly from the ruling in *Bushie v. Stenocord Corporation,* 460 F.2d 116 (9th Cir. 1972), which affirmed the trial court's grant of summary judgment as to counts alleging violations of sections 1 and 2 of the Sherman Act. In *Bushie,* plaintiffs were terminated from their position as distributors of Stenocord dictating machinery products. The defendant had hired an employee to help vertically integrate its operation. Arguing that Stenocord was the relevant market, plaintiff advanced the theory "that the exclusive control which Stenocord has over the sale and servicing of Stenocord products, as a result of the termination of his dealership, constitutes a monopoly proscribed by Section Two." 460 F.2d at 120. The court, however, held otherwise: "A manufacturer has a 'natural monopoly over his own products, especially when the products are sold under trademark . . . .' [Citation omitted]. *Unless the manufacturer used his natural monopoly to gain control of the relevant market in which his products compete,* the antitrust laws are not violated." *Id.* (emphasis added). The analogy to the instant case is clear. Plaintiff Neugebauer, as a wholesale distributor of Sunpapers, faces a "natural monopoly" when dealing with Abell at the wholesale level. Yet, in arguing that the wholesale market is the relevant market, plaintiff must also show how the natural monopoly there somehow turns into an *illegal* monopoly in the retail market which lessens competition in some impermissible, perhaps even predatory, manner.

**6.** Plaintiff's arguments concerning demand cross-elasticities show a flaw parallel to that manifested in his attempt to define the relevant market in terms of the newspaper distribution system. For example, plaintiff contends that cross-elasticity of demand in the wholesale market is zero because each Sunpaper is a unique product unavailable from any supplier other than Abell. This argument is nothing more than the "natural monopoly" argument which, as a matter of law, fails to allege a violation of the antitrust laws. Plaintiff rea-

sons that since *he* cannot demand Sunpapers from anyone other than Abell, Abell has no competition from possible substitutes. This logic would sap *Cellophane* and *Grinnell* of any meaning whatsoever and would hardly comport with *Grinnell's* requirement that "commercial realities" be evaluated. When these realities are considered, it becomes readily apparent that the relevant market for the application of the antitrust laws and cross-elasticity of demand principles is the newspaper retail market.

The *Bushie* court further amplified its explanation of the plaintiff's erroneous antitrust theories:

A single manufacturer's products might be found to comprise, by themselves, a relevant market for the purpose of a monopolization claim, if they are so dominant *in the market in which they compete* that any action by the manufacturer to increase his control over his product virtually assures that competition in the market will be destroyed. Cf. *United States v. United Shoe Machinery Corp.* [D.C.], *supra*, 110 F.Supp. [295] at 341–344; *Industrial Building Materials, Inc. v. Interchemical Corp.* [9 Cir.], *supra*, 437 F.2d [1336] at 1344. There is no suggestion in this case, however, that Stenocord dominated the market for office dictating machines generally, or that it controlled a major share of the market for machines of its particular type. To the extent that Bushie's argument suggests that the "relevant market" to be used in considering Stenocord's market share is to be arrived at by disregarding those other sellers of dictating equipment whose products are similar, both in design and function, because Bushie did not "consider" them competitors, we reject it. It is only by excluding such competition from the determination of the relevant market that Bushie hopes to show a market in which Stenocord would be the dominant figure. Since none of his proof would establish a "dangerous probability" of monopolization [*American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575 . . . ] in a properly defined market, summary judgment was proper.

460 F.2d at 121 (emphasis added). This passage makes it clear that the relevant market is the "market in which [the products] compete" which in the instant case is the retail market since, as plaintiff in effect argues, the wholesale market in Sunpapers is a natural monopoly lacking competition. It is clear, then, that for purposes of proving the relevant market, plaintiff has confused the natural monopoly in the wholesale market with the type of monopoly in the competitive retail market which, if found, might be the basis for imposing antitrust liability.[7]

These conclusions find support in numerous other cases which have rejected the notion that a natural monopoly in a case such as this can be converted into an illegal monopoly. *See, e. g., Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 421 F.Supp. 237, 244

---

7. Plaintiff's Trial Memorandum, at 5, displays the confusion of relevant markets in the following passage:

Under any interpretation of the term "relevant market" it is clear that Abell has monopoly power in the newspaper wholesale market. First, Abell is the sole supplier of the Sunpapers and by reason of this fact, plaintiff and other authorized carriers have no alternative source of supply for their business, regardless of the wholesale price Abell charges them for the newspapers. Even under the broad *duPont* definition for plaintiff's purpose there are no other products that are reasonably interchangeable because of the nature of his contractual relationship with Abell and the nature of the business in general. The Sunpapers is a "unique and distinctive" product to him because if he wishes to remain in his current business as a Sunpapers authorized carrier, the Sunpapers are the only product available to him for resale to his customers. For this reason, the situations in which the courts have defined the relevant market as simply the single product of the defendant is clearly applicable here.

The real issue raised here is whether plaintiff and Abell actually compete in the newspaper wholesale market. Plaintiff claims that they do and argues that defendant Abell, when selling at retail itself, establishes a stipulated "shadow" wholesale price for its own newspapers. In other words, plaintiff claims that Abell the wholesaler sells Abell papers to Abell the retailer. *See* note 2 *supra*. Plaintiff must invent such a fictional wholesale price in order to overcome the natural monopoly argument; however, his efforts in this respect are belied by the cases, such as *Bushie*, which recognize that such a natural monopoly is not actionable under the antitrust laws. *See* Transcript at 129 where one of plaintiff's expert witnesses comments that "[plaintiff], in fact, is paying the higher wholesale price. Now, we can't see directly what wholesale price the Sun charges itself; that is not something you can't [sic] document because the sale never takes place." Defendant has a natural monopoly at the wholesale level, and it is this fact, plus the fact that defendant also distributes at the retail level, which constitutes the basis of plaintiff's grievance.

n.11 (D.N.J.1976); *V. & L. Cicione, Inc. v. C. Schmidt & Sons, Inc.*, 403 F.Supp. 643, 651 (E.D.Pa.1975), aff'd, 565 F.2d 154 (3d Cir. 1977); *Allied Electric Supply Co. v. Motorola, Inc.*, 369 F.Supp. 133, 138 (W.D.Pa.1973); *A–1 Business Machine Co. v. Underwood Corp.*, 216 F.Supp. 36, 37 (E.D.Pa.1963). This issue was explicitly addressed by Judge Chestnut in *Arthur v. Kraft-Phenix Cheese Corp.*, 26 F.Supp. 824, 828 (D.Md. 1938):

> Every manufacturer has naturally a complete monopoly of his particular product especially when sold under his own private brands, and no private controversy with a distributor could legally tend to increase that type of a natural monopoly. The Sherman Act is, therefore, clearly not really involved.

*See also Mogul v. General Motors Corp.*, 391 F.Supp. 1305, 1314 (E.D.Pa.1975), aff'd, 527 F.2d 645 (3d Cir. 1976); *Schwing Motor Co. v. Hudson Sales Co.*, 138 F.Supp. 899, 906 (D.Md.), aff'd, 239 F.2d 176 (4th Cir. 1956), cert. denied, 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957) (". . . a real monopoly in the commodity [is necessary] and not the natural monopoly which a manufacturer has in his own product").

A recent Fifth Circuit case, *H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239 (5th Cir. 1978), also undercuts plaintiff's argument that the relevant product market is the Sunpapers alone. In *H & B*, a distributor sued a manufacturer who had commenced a direct distribution system of its own in competition with distributor-plaintiff's. Plaintiff alleged that the manufacturer wanted to drive him out of business in order to monopolize the hydraulic excavator market. Affirming the lower court's directed verdict for defendant, the Fifth Circuit held that "[t]he hydraulic excavator market . . . cannot be confined to International Harvester products alone." At 242. The Court required that other rival producers in the hydraulic excavator market also be considered. Having found that the relevant product market was at the retail level, the *H & B* court held that plaintiff had failed to prove the market share necessary to establish a monopoly:

[*H & B*] introduced no statistics on the number and size of firms in the market, and every hint the record gives indicates International Harvester's market position fell far short of being dominant.

*Id.* at 243. *See also Diehl & Sons, Inc. v. International Harvester Co.*, 426 F.Supp. 110, 121 (E.D.N.Y.1976) (test of relevant product market in area of "effective competition in which the defendant operates").

*Knutson v. Daily Review, Inc.*, 383 F.Supp. 1346 (N.D.Cal.1974), is persuasive authority for this Court's findings as to plaintiff's theories of antitrust liability and relevant product market. In *Knutson*, plaintiffs were independent dealers who purchased, distributed, and resold daily newspapers. As in the instant case, plaintiffs bought the papers at wholesale from the publisher. The defendant publisher established retail subscription charges which the independent dealers could then charge their customers. Although they had acquiesced in defendants' suggested pricing policies, the plaintiff dealers complained about the illegality of the price-fixing and other restraints and were terminated by the publisher which instituted its own in-house distribution facilities. Although plaintiffs were offered jobs as salaried district managers, they refused the offer and instead challenged the distribution practices under the antitrust laws.

■ Despite having found evidence of price-fixing under the independent dealership arrangement, the court held that there was no evidence of conspiracy or other antitrust law violations so as to make illegal the termination of the independent dealers. 383 F.Supp. at 1361. The court held that:

> a manufacturer [is not] forever bound to use the same system of distribution when sound business considerations suggest that a different method be used. Thus, a manufacturer can lawfully terminate an independent distributor and therefore sell exclusively through its own outlets.

383 F.Supp. at 1360–61. In pressing these section 1 claims, plaintiffs, like Neugebauer here, had to explain the scope of the rele-

vant product and geographic market; however, the court found their definition that the relevant product markets were community or suburban daily newspapers in specified areas of southern Alameda county was too narrow:

> While plaintiffs contend that the relevant product and geographic markets are community or suburban daily newspapers in specified areas of southern Alameda County where defendants publish the only community daily papers, the Court finds that this asserted market definition fails to take into account the cross-elasticities of demand among the community, satellite and metropolitan daily newspapers which circulate in southern Alameda County as well as the other media (television, radio, and free and controlled circulation papers) which competes for advertising in that area. *See United States v. duPont & Co.*, 351 U.S. 377, 393–400, 76

S.Ct. 994, 100 L.Ed. 1264 (1956); *United States v. Grinnell Corp.*, 384 U.S. 563, 571–576, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Plastic Packaging Materials, Inc. v. Dow Chemical Co.*, 327 F.Supp. 213, 229–230 (E.D.Pa.1971); *United States v. Chas. Pfizer & Co.*, 246 F.Supp. 464 (E.D. N.Y.1965).

383 F.Supp. at 1360 n.16. The *Knutson* court's reasoning is particularly relevant insofar as the instant case is concerned because in making its findings as to cross-elasticities and the presence of illegal restraints of trade, the court specifically based its findings on facts peculiar to the individual business involved. 383 F.Supp. at 1361. Taking these factors into consideration, the *Knutson* court found substantial evidence of competition between Bay area newspapers and other forms of communications media in the vicinity. 383 F.Supp. at 1366.[8]

---

**8.** In making these factual findings, the *Knutson* court distinguished the holding in *Bowen v. New York News, Inc.*, 366 F.Supp. 651, 675–76 (S.D.N.Y.1973), *aff'd in pertinent part, rev'd in part*, 552 F.2d 1242 (2d Cir. 1975). In *Bowen*, the trial court found that the daily paper in question there was a distinct line of commerce having no real substitute. The court specifically rejected the defendant's efforts to show that other media competed with the newspaper; however, it did recognize the existence of competition from numerous other newspapers. Yet the cases which the court relied on for this narrow definition of the relevant product market were premised upon factual determinations of the particular record. 366 F.Supp. at 675 n.56.

The issue presented in this case can be looked at in two ways: (1) whether defendants have shown the existence of the high cross-elasticity of demand which they claim is present, or (2) whether plaintiff has succeeded in showing the narrow relevant product market and low cross-elasticity needed to support his antitrust claims. This Court made it clear to plaintiff what his burdens were in its earlier ruling on the parties' cross-motions for summary judgment. Because plaintiff has failed to meet this initial burden, the Court does not have to reach a finding that defendants' description of their competition necessarily extends to other media. *See Knutson*, 383 F.Supp. at 1366 n.24.

Finally, *Bowen* undermines plaintiff's claim here that in his dealings with defendants he was functioning as a wholesaler. The trial court found that "franchise dealers also function as wholesalers in selling to their carrier boys," and that the News acted as a "wholesaler" in selling to various retail dealers and independent wholesalers. 366 F.Supp. at 666. The appeals court rejected the trial court's reasoning and went on to interpret "wholesaler" in terms of commercial realities: in determining whether a party to a Fair Trade Agreement is a "wholesaler," we must look to whether the franchisee buys for the purpose of reselling in gross and whether the persons to whom he sells actually resell at retail.

Judged by these standards, the franchise dealer here performs no true "wholesale" functions. Unlike the normal wholesaler, who buys in bulk and distributes to a broad spectrum of independent merchants who then resell for their own profits, here the Carrier Agreement clearly contemplates "sales" only to home subscribers. Although Paragraph (a)(5) of the McGuire Act prohibits Fair Trade agreements between wholesalers, its thrust is the prevention of price fixing between those in competition with sellers at the same functional level. *United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 313, 76 S.Ct. 937, 100 L.Ed. 1209. Even accepting the characterization of the transactions involved here as "resales" by the franchise dealers to the delivery boys, the distribution was exclusively through the franchise dealers to the delivery boys, so that The News, however its function is described, would never be engaged in selling directly to delivery boys or to home subscribers and thus would not have any occasion to agree with competing sellers upon the resale price. It would therefore be anomalous to classify as "wholesalers" buyers whose resales are solely to a narrow

In light of these authorities, plaintiff has not demonstrated that the relevant product market should be narrowly defined so as to include only the Sunpapers.

■ In the instant case, not only is there no basis for concluding that the wholesale market is the relevant product market, but there is no evidence showing that Abell has a dominant share of the newspaper retail market in the PMA.[9] At trial defendants demonstrated that they face effective competition in the PMA from the News American, the Annapolis Evening Capital, the Washington Post, the Washington Star, plus weekly papers, radio, and television, Transcript at 443, 449, and plaintiff himself admits the presence of such competition in paragraph nine of his Amended Complaint.[10] Plaintiff has not shown that Abell does not face substantial competition in the market for which its product was intended, i. e., the newspaper retail market. Furthermore, plaintiff has not shown that the Sunpapers are so unique as to create a one-brand market, and plaintiff cannot meet this burden by showing either that Abell has a natural monopoly of its own product or that the particular distribution system employed somehow makes the Sunpapers unique. *Telex v. International Business Machines Corp.*, 510 F.2d 894, 917–19 (10th Cir.), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975); *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290 (7th Cir. 1974) (Stevens, J.); *Bushie v. Stenocord Corp., supra*; *Nelligan v. Ford Motor Co.*,

262 F.2d 556 (4th Cir. 1959); *Packard Motor Car Co. v. Webster Motor Car Co.*, 100 U.S.App.D.C. 161, 243 F.2d 418, *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957); *H. L. Moore Drug Exchange v. Eli Lilly & Co.*, 457 F.Supp. 75 (S.D.N.Y.1978); *Merit Motors, Inc. v. Chrysler Corp.*, 417 F.Supp. 263 (D.D.C.1976), *aff'd*, 187 U.S. App.D.C. 11, 569 F.2d 666 (1977), *V. & L. Cicione, Inc. v. C. Schmidt & Sons, Inc.*, 403 F.Supp. 643 (E.D.Pa.1975), *aff'd*, 565 F.2d 154 (3d Cir. 1977); *Mogul v. General Motors Corp.*, 391 F.Supp. 1305 (E.D.Pa.1975), *aff'd*, 527 F.2d 645 (3d Cir. 1976); *Varney v. Coleman Co.*, 385 F.Supp. 1337 (D.N.H.1974); *Allied Electric Supply Co. v. Motorola, Inc.*, 369 F.Supp. 133 (W.D.Pa.1973); *Cal. Distributing Co. v. Bat Distributors, Inc.*, 337 F.Supp. 1154 (M.D.Fla.1971); *Brewer Sewing Supplies Co. v. Fritz Gegauf, Ltd.*, 1970 Trade Cas. ¶ 73,139 (N.D.Ill.1970); *E. A. Weinel Construction Co. v. Mueller Co.*, 289 F.Supp. 293 (E.D.Ill.1968); *South End Oil Co. v. Texaco, Inc.*, 237 F.Supp. 650 (N.D.Ill. 1965); *A–1 Business Machine Co. v. Underwood Corp.*, 216 F.Supp. 36 (E.D.Pa.1963); *Johnny Maddox Motor Co. v. Ford Motors Co.*, 202 F.Supp. 103 (W.D.Tex.1960); *Schwing Motor Co. v. Hudson Sales Co.*, 138 F.Supp. 899 (D.Md.), *aff'd*, 239 F.2d 176 (4th Cir. 1956), *cert. denied*, 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957).

Having failed to show that defendants have exercised monopoly power in the relevant product market, plaintiff has obviously

---

group of this nature. 522 F.2d at 1251 (footnote omitted). Although the court's reasoning was framed with reference to the McGuire Act's prohibitions of unfair methods of competition, 15 U.S.C. § 45(a), its conclusions are generally applicable to the present case. While both Neugebauer and defendants sold directly to home subscribers there has been no evidence of any conspiracy, or unfair or anticompetitive practices insofar as defendants' behavior has been concerned. The testimony at trial showed that defendants began their home delivery solicitations to increase circulation and not to deprive plaintiff of any customers.

**9.** Defendants note that in *H & B, supra*, plaintiff attempted to establish a submarket consisting solely of one particular International Harvester model. The court concluded that while the 3960 model was sold only by International

Harvester, this fact was insufficient to create an issue for the jury. Accordingly, defendants note that there is no evidence that the Sunpapers is unique enough in the newspaper market to constitute a proper submarket. Defendants' Memorandum In Support of Motion for Directed Verdict at 16 n.13.

**10.** Paragraph 9 of the Amended Complaint refers to the News American as "another high quality newspaper of general circulation in the Baltimore area with a circulation almost as great as that of the Sun. . . ." Plaintiff continues, adding that "[o]ther papers from nearby cities such as the Washington Post do compete at retail with the Sun but account for a relatively small portion (5%–25%) of the job market sales in the area which constitutes defendant's marketing area."

failed to show that this power created a "dangerous probability" of success in controlling prices and excluding competition. *Swift & Co. v. United States*, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905). *See also E. J. Delaney Corp. v. Bonne Bell, Inc.*, 525 F.2d 296, 305 (10th Cir. 1975), *cert. denied*, 425 U.S. 907, 96 S.Ct. 1501, 47 L.Ed.2d 758 (1976); *McElhenney Co. v. Western Auto Supply*, 269 F.2d 332, 339 (4th Cir. 1959). The Supreme Court has held that proof of the relevant market is essential in an attempted monopolization case as well as a monopolization case. *Walker Process Equipment, Inc. v. Ford Machinery & Chemical Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

## IV. A SQUEEZE WAS UNNECESSARY

■■■ Even more detrimental to plaintiff's cause than his mistaken theories about relevant market is the fact that defendant Abell could eliminate independent carries directly, without resorting to a squeeze tactic, and still be immune from antitrust liability. The fact that plaintiff and defendant may compete in their retail pricing in and of itself is not contrary to the antitrust laws, unless, of course, predatory tactics or other anticompetitive practices are employed to destroy competition in order to permit prices to rise in the long run. Yet, again, why would defendants want to wipe out plaintiff through costly and frequently wasteful predatory pricing when they could simply terminate his carrier position by fiat?

Because Abell has a natural monopoly over its own product, the extent of any retail competition is obviously dependent upon the will of Abell. *See United States v. Klearflax Linen Looms*, 63 F.Supp. 32, 38 (D.Minn.1945), *citing Federal Trade Commission v. Beech-Nut Packing Co.*, 257 U.S. 441, 456–57, 42 S.Ct. 150, 66 L.Ed. 307 (1922) (Holmes, J., dissenting). At trial it was argued that since Abell depended on advertising revenue rather than subscription revenue for 80 to 85% of its income it did not need to begin a direct delivery campaign and that consequently the only mo-

tive for direct delivery was Abell's intent to monopolize the newspaper retail market. Testimony showed, however, that Abell's solicitation program was simply intended to generate additional revenue to offset the effect of recent circulation losses. There was no evidence that Abell intended to monopolize the newspaper retail market or drive plaintiff out of business. *See* Transcript at 263–66.

As an integrated industry, Abell made and sold directly its own product. In doing so, it also made use of independent carriers such as plaintiff in a delivery or distribution system which also utilized street sales and direct home delivery. Although termination of a dealership, franchise or other type of distribution system might, in particular situations, give rise to actions sounding in contract law, the termination standing by itself is not necessarily an antitrust violation.

The *Bushie* court, *supra*, not only faced a so-called natural monopoly situation but also dealt with a set of facts involving termination of plaintiff's retail dealership. Holding that such termination was proper absent evidence of conspiracy to eliminate competition in the relevant product market, the court reasoned as follows:

It is well settled that a manufacturer may discontinue dealing with a particular distributor "for business reasons which are sufficient to the manufacturer, and adverse effect on the business of the distributor is immaterial in the absence of any arrangement restraining trade." *Ricchetti v. Meister Brau, Inc.*, 431 F.2d 1211, 1214 (9th Cir. 1970), cert. denied, 401 U.S. 939, 91 S.Ct. 934, 28 L.Ed.2d 219; *Jos. E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755, reh. denied, 397 U.S. 1003, 90 S.Ct. 1113, 25 L.Ed.2d 415; *Scanlan v. Anheuser-Busch, Inc.*, 388 F.2d 918 (9th Cir. 1968), cert. denied, 391 U.S. 916, 88 S.Ct. 1810, 20 L.Ed.2d 654.

\*     \*     \*     \*     \*     \*

True, the effect of the agreement was to eliminate Bushie as a Stenocord dealer.

But this alone would not support a conclusion that Stenocord's motive was anticompetitive. A manufacturer is free to agree with a third party to give him an exclusive distributorship "even if this means cutting off another distributor," *Jos. E. Seagram & Sons, Inc. v. Hawaiian Oke Liquors, Ltd., supra,* 416 F.2d at 76, so long as in doing so there would be no resulting restraint of trade. *Ricchetti v. Meister Brau, Inc., supra.* To hold otherwise would be to "saddle [defendant] with [plaintiff's] services forever." *Cartrade, Inc. v. Ford Dealers Advertising Ass'n,* 446 F.2d 289, 294 (9th Cir. 1971). Bushie's proof shows, and Stenocord admits, an agreement; but it does not show that the agreement was for any purpose prohibited by Section One.

460 F.2d at 119–20. *See also Lorain Journal v. United States,* 342 U.S. 143, 155, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *Associated Press v. United States,* 326 U.S. 1, 15, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *United States v. Bausch & Lomb Co.,* 321 U.S. 707, 721–23, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919). The Fourth Circuit reached a similar conclusion in a franchise cancellation case where it held that:

Generally speaking, the right of customer selection is sanctioned by both statute and case law. Absent conspiracy or monopolization, a seller engaged in a private business may normally refuse to deal with a buyer for any reason or with no reason whatever. Thus, the courts have until now not held a seller liable in damages for refusing to deal with one who is unwilling to enter into an unlawful vertical price agreement or an exclusive dealing arrangement. Clothed with this privilege, the seller not only may, but ordinary fairness would require that he should announce in advance the circumstances under which he will do business with others.

*McElhenney Co. v. Western Auto Supply Company,* 269 F.2d 332, 337 (4th Cir. 1959) (Sobeloff, C. J.). *See also Marquis v. Chrysler Corp.,* 577 F.2d 624, 640 (9th Cir. 1978)

(*citing Bushie, supra*); *Call Carl, Inc. v. BP Oil Corporation,* 403 F.Supp. 568, 574–76 (D.Md.1975) (Young, J.), *aff'd in part, rev'd in part,* 554 F.2d 623 (4th Cir.), *cert. denied,* 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977).

In *Diehl & Sons, Inc. v. International Harvester Co.,* 426 F.Supp. 110 (E.D.N.Y. 1976), a truck distributor and its subsidiary lessor brought an antitrust action against International Harvester Co. ("Harvester") claiming that the latter was conspiring to eliminate them as retailers of Harvester products. Holding that there was no conspiracy in restraint of trade and that the relevant market could not consist solely of the brand of vehicle produced only by Harvester, the court noted that "Harvester could unilaterally have driven Diehl out of the market for Harvester products, as it ultimately did on April 21, 1975." 426 F.Supp. at 117. Insofar as any restraint of trade was concerned, the court reasoned as follows:

Thus, even assuming that some conspiracy did exist between Harvester and someone else to eliminate Diehl and TRAC as retailers of Harvester products, such conduct is without antitrust significance. No antitrust objective would be served by holding that a manufacturer cannot terminate its independent distributors and replace them with its own distribution system, absent a showing that the termination was designed to further some collateral prohibited activity, such as, enforcing a tying arrangement, eliminating price-cutters, or creating or strengthening a monopoly position, see *Bushie v. Stenocord Corp.,* 460 F.2d 116, 119 (9th Cir. 1972); *Ace Beer Distributors, Inc. v. Kohn, Inc.,* 318 F.2d 283, 287 (6th Cir.), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963), none of which are even arguably present here.

426 F.Supp. at 119 (footnote omitted). *See also Marquis, supra,* 577 F.2d at 640; *Knutsen v. Daily Review,* 548 F.2d 795, 803 (9th Cir. 1976); *Chisholm Bros. Farm Equipment Co. v. International Harvester Co.,* 498 F.2d 1137, 1143 (9th Cir.), *cert. denied,*

419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 76 (9th Cir. 1969); *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 *reh. denied*, 397 U.S. 1003, 90 S.Ct. 1113, 25 L.Ed.2d 415 (1970).

*Ace Beer Distributors, supra*, involved a situation in which a brewer allegedly conspired to destroy one distributor's business by terminating its franchise and conducting its business through another distributor. As the court concluded,

> That, without the results proscribed by the Sherman Act, is not a violation of the Act. A manufacturer has a right to select its customers and to refuse to sell its goods to anyone, for reasons sufficient to itself. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. A refusal to deal becomes illegal under the Act only when it produces an unreasonable restraint of trade, such as price fixing, elimination of competition or the creation of a monopoly. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 32, 80 S.Ct. 503, 4 L.Ed.2d 505; *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219; *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162. The fact that a refusal to deal with a particular buyer without more, may have an adverse effect upon the buyer's business does not make the refusal to deal a violation of the Sherman Act. Damage alone does not constitute liability under the Act.

> \*    \*    \*    \*    \*    \*

> Unless it can be said that the refusal to deal with plaintiff had the result of suppressing competition and thus constituted "restraint of trade" within the meaning of Section 1 of the Sherman Act, there is no violation of the Act.

318 F.2d at 286–87. Both *Diehl* and *Ace Beer* would seem to be dispositive authority for the outcome of the present case: while the impact of Abell's activities may have been detrimental to plaintiff, there has been *no* showing whatsoever that it was "designed to further some collateral prohibited activity." *Diehl, supra*, 426 F.Supp. at 119.

## V. PLAINTIFF'S EXPERT WITNESSES

■ There is every good reason to believe that if plaintiff had sold Sunpapers at a price which maintained *his* prior profit spread and exceeded Abell's suggested retail price, he would have incurred circulation losses which would likewise, in turn, have hurt the Sunpapers. He obviously could not charge more than Abell's direct delivery service charged or he would have lost sales to Abell directly. Hence, the Sunpapers' suggested retail prices put an upper limit on plaintiff's ability to compensate for this declining profit margin due to the increase in wholesale prices to him. As his wholesale prices increased, his profit margin therefore decreased.

At trial, plaintiff called two expert witnesses to testify to the economic impact of Abell's activities upon his independent carrier business. One of the experts, Dr. Paul Gallagher explained that the problem which plaintiff faced was two-fold: (1) after May, 1968 his profit margin began to decline because (2) Abell would not raise its retail price so as to maintain the profit spread which existed before it raised its wholesale price to Neugebauer. Abell's refusal to raise its retail price similarly meant that plaintiff could not raise his retail price, and he found himself caught in a squeeze between a fixed upper retail price and a gradually escalating wholesale price. While Dr. Gallagher's explanation of the squeeze on Neugebauer made sense in terms of its overall effect, his testimony as to damages recoverable by plaintiff made very little sense at all. In moving to strike Dr. Gallagher's testimony, defendant explained that there was a "logical fallacy" in the expert's conclusion that plaintiff should recover damages including lost profits because plaintiff was prevented from raising his retail price to maintain his profit spread.

As defendant Abell correctly pointed out, Dr. Gallagher stated at trial that plaintiff would have *no* case at all against Abell if it

had continued to charge a retail price in its own direct delivery service which maintained its pre-May, 1968 profit spread. Presumably, doing this would enable plaintiff to continue to raise his prices whenever Abell increased its retail prices. Yet, defendant points out that the evidence shows that if Abell *had* maintained this spread, its retail prices would have actually been *lower* than the price Neugebauer actually charged. Transcript at 347–52. Consequently, plaintiff would have been forced to *lower* not raise his prices to meet any effective competition from Abell. Defendant therefore concludes that plaintiff is not entitled to lost profits for his inability to *raise* his price when Abell's hypothetically maintaining the pre-May, 1968 profit spread would have forced him to *lower* his price.[11] Transcript at 173–79, 201.

## VI.  THE REMAINING COUNTS

### A.  Territorial restriction

■ Plaintiff claims that his contract with Abell violates section 1 of the Sherman Act because of certain language therein which allegedly limits plaintiff's delivery activities to an "area of primary responsibility." Consequently, plaintiff alleges that he is effectively prevented from delivering newspapers outside the geographic area described in the contract. Nothing at trial indicated that plaintiff had either tried to deliver or had been prevented from delivering Sunpapers outside the area specified in the contract. Since a "primary responsibility" provision has been held not to be invalid unless it violates the rule of reason, *Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433

U.S. 36, 58–59, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), plaintiff bore the burden of demonstrating the impropriety of such a restriction. Defendant, on the other hand, has argued that such a clause is reasonably related to its distribution goals such as customer referrals and servicing complaints. No anticompetitive effects have been demonstrated by plaintiff.

### B.  Exclusive dealing

■ Plaintiff's exclusive dealing arguments also submit allegations which are more hypothetical than real. Paragraphs 5(b) and 5(d) of plaintiff's contract with Abell require him to "devote substantially his full working time" to delivering Sunpapers in order to protect the newspaper's "good-will". The contract furthermore forbade him from "mak[ing] simultaneous delivery of, or insert[ing] in, attach[ing] or plac[ing] with the newspapers any printed matter or material not supplied by Publisher. . . ." The latter restriction makes sense in terms of the defendant's wishes to retain its good-will and prohibits, therefore, *simultaneous* delivery. Plaintiff is free, therefore, to make additional deliveries in any fashion other than simultaneously with his delivery of Sunpapers. Finally, testimony at trial showed that plaintiff and his family spend virtually all of their working time on the Sunpapers delivery route. Transcript at 12–18. Plaintiff has not alleged that he has endeavored to distribute other newspapers than the Sunpapers, that other newspapers are available for an independent adult carrier service, or that he

---

**11.** Although not explained clearly at trial, presumably Abell itself faced an upper limit on its own retail price, and this upper limit was set by competition from other newspapers selling or publishing in the PMA. Depending on the demand elasticity at the newspaper retail level, raising retail prices beyond a certain point might, given the slope of the demand curve, actually decrease overall revenues since the income lost from circulation decrease might well exceed that generated by the higher retail price. Looked at from a different perspective, "a manufacturer is likely to view the difference between the price at which it sells to its retailers and their price to the consumer as its 'cost

of distribution,' which it would prefer to minimize." *Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 56 n.24, 97 S.Ct. 2549, 2561, 53 L.Ed.2d 568, citing Posner, *Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions*, 75 Colum.L. Rev. 282, 283 (1975). *See also* Recent Cases, 88 Harv.L.Rev. 636, 641 (1975) ("generally a manufacturer would prefer the lowest retail price possible, once its price to dealers has been set, because a lower retail price means increased sales and higher manufacturer revenues").

would have the time to make such distributions. Accordingly, these claims must fail.

### C. Maryland antitrust law

■ The Maryland Antitrust Act, Md. Com.L.Code Ann. §§ 11–201 through 11–213 is intended "to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest intrastate competition." Portions of the Maryland statute were "carefully and purposefully patterned after their counterparts in the federal law," General Revisor's Note to the Maryland Antitrust Act, and the specific section relied on by plaintiff, § 11–204(a) and (b), adds nothing new to his allegations brought under federal antitrust law. Since plaintiff's federal cause of action must fail, his state claims which merely duplicate the federal ones must meet a similar fate.

### VII. THE PROPRIETY OF A DIRECTED VERDICT

■ The Supreme Court has admonished that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent may play leading roles . . . ." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The standard for granting a judgment notwithstanding a verdict under F.R.Civ.P. 50 is the same as that for granting a motion for a directed verdict. *Hawkins v. Simm,* 137 F.2d 66, 67 (4th Cir. 1943). Accordingly, directed verdicts must be reviewed carefully in light of the standard which asks whether, viewing the evidence in the light most favorable to the nonmoving party and without weighing the credibility of the witnesses, a reasonable jury could have reached but only one conclusion as to the verdict. *Brady v. Southern Ry.*, 320 U.S. 476, 479, 64 S.Ct. 232, 88 L.Ed. 239 (1943); *Marquis v. Chrysler Corp.*, 577 F.2d 624 (9th Cir. 1978); *Ralston Purina Co. v. Edmunds*, 241 F.2d 164, 167 (4th Cir.), *cert. denied,* 353 U.S. 974, 77 S.Ct. 1059, 1 L.Ed.2d 1136

(1957); *Call Carl, Inc., supra*, 403 F.Supp. at 576. *See also Continental Ore Co. v. Union Carbide & Carbon Co.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

Plaintiff has brought this case under sections 1 and 2 of the Sherman Act. To show an unreasonable market restraint under section 1, plaintiff must first isolate the relevant market which the alleged restraint affects. As already explained, plaintiff has failed to show that the relevant market is the newspaper wholesale market. Effective competition in terms of the commercial realities of the product involved in this case lies not in the area of natural monopoly but rather in the retail market.

Insofar as section 2 is concerned, plaintiff claims that defendants monopolized or attempted to monopolize the relevant product market, that they did so with specific intent to monopolize, and that there was a dangerous probability of their succeeding. The definition of relevant market is, therefore, of immense relevance in examining an attempt to monopolize. *Walker, Inc. v. Food Machinery*, 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Joe Westbrook, Inc. v. Chrysler Corp.*, 419 F.Supp. 824, 844 (N.D.Ga.1976); *Southern Concrete Co. v. United States Steel Corp.*, 394 F.Supp. 362, 379 (N.D.Ga.1975), *aff'd*, 535 F.2d 313 (5th Cir. 1976), *cert. denied*, 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977). Having failed in his claim as to the appropriate relevant market, plaintiff's section 2 claim must meet a similar fate. Since the relevant market is the newspaper retail market and plaintiff has failed to show defendant's specific intent to drive out competitors, engage in unlawful predatory conduct, or have a dangerous probability of success, a directed verdict in defendants' favor is mandated. Additionally, there is no evidence in the record from which any of the relevant anticompetitive activities may be inferred. *Marquis, supra*, 577 F.2d at 641; *Knutson, supra*, 383 F.Supp. at 1360. While defendants may have harmed plaintiff by terminating his distributorship, this alone is insufficient to constitute a claim under the antitrust laws.

Accordingly, it is this 25th day of June, 1979, by the United States District Court for the District of Maryland, ORDERED: That the defendants' motion for a verdict under Rule 50(b) of the Federal Rules of Civil Procedure dismissing the remaining counts of plaintiff's Amended Complaint be, and the same is, hereby GRANTED.