**Gweldon Lee PASCHALL and All Intervenors, Appellees,**

v.

**The KANSAS CITY STAR COMPANY, Appellant.**

**No. 81–1963.**

United States Court of Appeals, Eighth Circuit.

Submitted March 10, 1982.

Decided Dec. 20, 1982.

Rehearing and Rehearing En Banc Granted Feb. 1, 1983.

---

324

Daniel K. Mayers, A. Douglas Melamed, David Westin, Wilmer, Cutler & Pickering, Washington, D.C., John T. Martin, Sam L. Colville, Gary L. Whittier, Shook, Hardy & Bacon, Kansas City, Mo., for appellant.

Sheridan Morgan, Harry A. Morris, Donald H. Loudon, David M. Rhodus, Morris, Larson, King, Stamper & Bold, Kansas City, Mo., for appellees.

William F. Baxter, Asst. Atty. Gen., Barry Grossman, Stephen F. Ross, Attys., Dept. of Justice, Washington, D.C., for United States, amicus curiae.

Before HEANEY, BRIGHT and HENLEY,* Circuit Judges.

HEANEY, Circuit Judge.

The Kansas City Star Company appeals from an order of the district court permanently enjoining it from refusing to sell its newspapers at wholesale rates to independent contract carriers. The district court held that the company's proposal to directly distribute its newspapers through its own

---

* The Honorable J. SMITH HENLEY assumed senior status on June 1, 1982.

delivery agents and to eliminate independent carriers violated Section 2 of the Sherman Act. We affirm.

## I.

### BACKGROUND.

*The Kansas City Star* was founded in 1880 as an evening newspaper. It expanded in 1894 to include a Sunday morning edition, *The Sunday Star,* and again in 1901 to include a morning paper, *The Kansas City Times.* From 1905 until 1942, the *Star, Times* and *Sunday Star* competed primarily with the *Kansas City Post* and *Kansas City Journal.* The *Post* and the *Journal* merged in 1922, but went out of business in 1942. Since then, the *Star, Times* and *Sunday Star,* all published by The Kansas City Star Company (hereafter the Star), and all different editions of the same newspaper, have been the only daily metropolitan newspapers published in the Kansas City, Missouri, and Kansas City, Kansas, metropolitan area.

In 1955, the Star was convicted of attempted and actual monopolization in violation of the Sherman Act. *Kansas City Star Co. v. United States,* 240 F.2d 643 (8th Cir.1957). The conviction was based on the Star's predatory practices in driving its competitors out of business and preventing others from entering the Kansas City newspaper market.

Since nearly its inception, the Star's newspapers have been distributed by independent carriers who purchase papers from the publisher at a wholesale rate, and then resell and deliver them to subscribers. Each independent carrier serves an exclusive distribution area. Hence, the only competition an independent carrier faces is from the Star itself, which expressly reserves the right in its delivery contracts to directly sell and deliver its newspapers to anyone. In fact, however, the Star seldom directly delivers newspapers to customers. The district court found that actual competition between the Star and the independent carriers was *de minimis.* It also found, however, that the Star's presence on the edge of the distribution market has a restraining effect on the retail prices set by independent carriers.

On May 24, 1974, the Star sent a letter to each independent carrier stating that the company might choose to modify or change its method of distribution, and declaring that it believed that it could do so without liability to the independent carriers. Beginning on June 1, 1974, the Star required any individual signing a new independent carrier contract to acknowledge in writing that he or she had read and understood the company's May 24, 1974, letter. These actions by the Star prompted plaintiff Gweldon Paschall to initiate this lawsuit in January, 1975, to determine whether such a change by the Star would violate the antitrust laws.

In fall, 1976, Capital Cities Communications, Inc., a New York-based communications conglomerate, made a $125 million tender offer to the Star's stockholders. On February 15, 1977, Capital Cities completed its acquisition of the Star. In analyzing the Star prior to purchase, Capital Cities' officers were concerned with the Star's low revenue per delivered copy, which was largely attributed to the Star's independent carrier distribution system.

In September, 1977, shortly after the Capital Cities' takeover, the Star announced its intention to change its distribution system. It proposed to terminate its existing contracts with independent carriers, and to replace them with its own agents who would directly sell and deliver papers to readers. No newspapers would be sold at wholesale to any independent carriers. As a result, the Star would have a monopoly in the retail, as well as publishing, market for daily metropolitan newspapers. The Star, however, offered all existing independent carriers the opportunity to become delivery agents for the company. The agency agreements would enable the carriers to earn approximately the same income that they did under the existing system.

Plaintiff Paschall, joined by approximately 250 other carriers who had intervened as plaintiffs, moved for a temporary restraining order and preliminary injunction. On

November 19, 1977, following an evidentiary hearing, the district court, the Honorable Elmo B. Hunter, issued a preliminary injunction barring implementation of the new distribution system.[1] The case was then assigned to the Honorable Warren K. Urbom to determine whether the Star had violated the antitrust laws. Following a nonjury trial, Judge Urbom found that the Star's proposal to discontinue wholesale vending of its papers to independent carriers constituted an illegal expansion of a monopoly under Section 2 of the Sherman Act. Following Judge Urbom's denial of a motion for reconsideration, Judge Hunter certified an interlocutory appeal. This Court initially granted leave to take the appeal, but subsequently vacated it as improvidently granted. *Paschall v. Kansas City Star Co.,* 605 F.2d 403 (8th Cir.1979). The case was remanded to the district court to determine if the plaintiff and intervenors had shown the requisite injury and causation to warrant relief. On remand, the district court, the Honorable William R. Collinson, found sufficient injury and causation, and entered a permanent injunction. The Star then appealed to this Court. The United States Justice Department filed a brief as *amicus curiae* arguing that the district court erred in finding a Sherman Act violation.

## II.

### LIABILITY.

The plaintiffs and intervenors (hereafter plaintiffs) do not challenge the Star's right to sell and deliver its own newspapers. They do contend, however, that the Star's proposed refusal to sell them papers at wholesale rates is an act of monopolization which violates Section 2 of the Sherman Act, 15 U.S.C. § 2. They argue that by so refusing to deal, the Star is unlawfully extending its monopoly in the publishing market to the presently competitive retail sale and delivery market.

### A. Monopolization.

■ In order to establish monopolization in violation of Section 2, the plaintiffs here must prove that the defendant: (1) possessed monopoly power in the relevant market, and (2) used it, whether lawfully or unlawfully acquired, to foreclose competition, gain a competitive advantage, or destroy a competitor.[2] *Von Kalinowski, 3 Antitrust Laws and Trade Regulation,* § 8.02[1], at 5 (Cum.Supp.1981). *See United States v. Griffith Corp.,* 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948); *Berkey Photo, Inc. v. Eastman Kodak,* 603 F.2d 263, 275–276 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

Our threshold inquiry then is whether the defendant enjoys a monopoly in the relevant market.[3] The Star does not dispute the district court's findings that the relevant product market is metropolitan daily newspapers sold at wholesale,[4] that the relevant geographical market is the seven-

1. Prior to the issuance of the preliminary injunction, the Star successfully replaced some of the independent carriers with delivery agents. The record does not reveal the number of delivery agents presently in place.

2. Such uses of monopoly power to restrict or eliminate competition or competitors permit an inference to be drawn of intent to monopolize, which Section 2 requires in actual monopolization cases. Specific intent to monopolize need not be established. The plaintiffs need only prove general intent, that is that the defendant intended to engage in the practices which reduced competition. *See Von Kalinowski, 3 Antitrust Laws and Trade Regulation,* § 8.02[4], at 8–41—8–64 (1982) (collected cases).

3. The relevant market consists of two parts—the product market and the geographic market. The relevant product market consists of the goods and/or services with which defendant's product competes. The relevant geographic market is the geographic area of effective competition in which the defendant's product is traded. *Id.* at § 8.02[2], 8–8—8–30.

4. The district court concluded that other media—suburban newspapers, shoppers, handbills, news magazines, television and radio— are sufficiently different in purpose, content, technique and audience appeal to constitute a separate product market. Moreover, it determined that none of the other media alone or in combination are an adequate substitute for the metropolitan daily newspaper.

county metropolitan area of Kansas City, Missouri, and Kansas City, Kansas,[5] and that the defendant enjoys monopoly power in these markets. We agree that these findings are sound and, accordingly, affirm them.

The remaining question then is whether the Star, as a vertically integrated monopolist,[6] used its monopoly power to foreclose competition, gain a competitive advantage, or destroy a competitor. *See supra,* at 326. Specifically, we must consider whether the Star's proposed refusal to sell its newspapers at wholesale rates to independent carriers, which would give it a monopoly in the retail distribution of metropolitan daily newspapers, constitutes an unlawful abuse of its existing monopoly power in the publishing or wholesale market.

B. *Refusals to Deal.*

 As a general rule, a company has a right to deal—or not to deal—with whomever it pleases, so long as the determination is made unilaterally.[7] *See, e.g., United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *Byars v. Bluff City News Co.,* 609 F.2d 843, 854 (6th Cir.1979). A monopolist, however, has added obligations which impose upon it a duty to deal in some circumstances. *Byars v. Bluff City News Co., supra,* 609 F.2d at 854–855.

[5, 6] The Star seeks to refuse to deal with the independent carriers in order to integrate forward into the distribution of its newspapers. Such vertical integration by a monopolist may have either pro- or anticompetitive effects. *See infra,* at 328. *See also Auburn News Co. v. Providence Journal Co.,* 659 F.2d 273, 278 (1st Cir. 1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). Thus, a refusal to deal designed to accomplish vertical integration, without more, does not violate the Sherman Act. *Id.* at 278; *Byars v. Bluff City News Co., supra,* 609 F.2d at 851. *See United States v. Columbia Steel Co.,* 334 U.S. 495, 525–526, 68 S.Ct. 1107, 1123, 92 L.Ed. 1533 (1948). Rather, the extent of permissible vertical integration must be governed by the facts and circumstances of each individual case. Here, the Star's proposal to refuse to deal with the independent carriers and, instead, to deliver its own newspapers violates Section 2 of the Sherman Act only if the plaintiffs established that such vertical integration will result in substantial anticompetitive effects that are not offset by production economies, savings in market transaction costs, or other competitive benefits. *See Auburn News Co. v. Providence Journal Co., supra,* 659 F.2d at 278; *Byars v. Bluff City News Co., supra,* 609 F.2d at 859–863.[8] On the record here, we hold that the plaintiffs have established

---

5. The district court based this finding on the fact that between eighty and eighty-four percent of the Star's newspapers are delivered to readers within those seven counties.

6. Vertical integration is the inclusion within a single firm of two or more stages in the production or distribution of an end product. A firm integrates "downstream" or "forward" when it undertakes further processing or distribution of a product that has been or could be sold to independent producers or distributors. The key difference between vertical integration by a competitive firm and vertical integration by a monopolist is that monopoly at one stage of the production-distribution process may carry with it the power to affect competition in earlier or later stages. Areeda & Turner, 3 *Antitrust Laws,* ¶¶ 723–725 (1978).

7. Concerted refusals to deal, of course, are generally *per se* violative of Section 1 of the Sherman Act. *See, e.g., Klor's, Inc. v. Broadway-*

*Hale Stores,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Sullivan, *Antitrust* §§ 83 *et seq.* (1977).

8. Both *Auburn News Co. v. Providence Journal Co.,* 659 F.2d 273 (1st Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982), and *Byars v. Bluff City News Co.,* 609 F.2d 843 (6th Cir.1979), involved challenges by independent newspaper carriers to the decisions by alleged monopoly newspapers to directly deliver their own product and to eliminate independent carriers. In *Auburn News Co. v. Providence Journal Co., supra,* 659 F.2d at 278, the Court found no Sherman Act violation because the refusal to deal did not reduce competition in the delivery market. In *Byars v. Bluff City News Co., supra,* 609 F.2d at 864, the Court remanded the matter to the district court to determine whether the newspaper enjoyed a monopoly in the relevant market.

that the Star's proposed refusal to deal violates the Sherman Act.

The Star, joined by the United States Justice Department as *amicus curiae,* contends that, as a matter of law, the company's refusal to deal is not unlawful because economic theory shows that it will produce pro-competitive rather than anticompetitive results. They theorize as follows: Under any given cost and demand conditions, there is a single price which will maximize a monopolist's profit. If the monopolist charges more than the "profit-maximizing" price, its profit will be less than optimal because the decrease in revenue from reduced sales, due to the higher price, will exceed the increase in revenue from the higher price. Moreover, a monopolist can extract its maximum monopoly profit only once from the sale of any given end product. If a monopolist attempts to increase that profit by integrating forward and charging a higher retail price, it will be unsuccessful because, again, the decline in revenue from the decreased demand will exceed the increase from the higher price. Consequently, a monopolist cannot increase its profits by integrating forward unless it can directly distribute its product at a lower cost than the independent distributors. *See, e.g.,* Areeda & Turner, 3 *Antitrust Laws,* ¶¶ 725–726 (1978); Posner, *Antitrust Cases, Economic Notes and Other Materials,* 704–708 (1974); Bork, *The Antitrust Paradox,* 242–243 (1973).

The Star and *amicus* urge that the Star's decision to integrate forward shows that it can distribute its newspapers more efficiently than the independent carriers. They claim, therefore, that the Star's proposed action does not violate Section 2 because it will result in lower prices and better service for consumers, and lower costs and increased sales for the Star.

The analysis advanced by the Star and the *amicus,* while plausible, is incomplete. The commentators they rely upon recognize that vertical integration by a firm with monopoly power may also produce anticompetitive effects. It may permit price and service discrimination between consumers, increase barriers to entry at the first level, facilitate evasion of government regulation of monopoly profits at the first level, or otherwise enable the monopolist to more fully exploit its dominant first-level market power.[9] *See, e.g.,* Areeda & Turner, 3 *Antitrust Laws, supra,* at ¶¶ 725–726; A. Neale, *The Antitrust Laws of the United States of America,* 127–133 (2d ed. 1970); Note, *Refusals to Deal by Vertically Integrated Monopolists,* 87 Harv.L.Rev. 1720, 1727–1730 (1974).

Moreover, even though vertical integration by a monopolist might theoretically lead to pro-competitive results, some commentators have suggested that it nonetheless may be beneficial to preserve competition at the retail level because competitors are often more efficient or innovative than monopolists. *See, e.g.,* Sullivan, *Antitrust,* 129 (1977); Areeda, *Antitrust Analysis, Problems, Text, Cases,* ¶ 610, at 522 (1967); Note, *Refusals to Deal by Vertically Integrated Monopolists, supra,* 87 Harv. L.Rev. at 1730 & n. 62. In fact, there is empirical evidence showing that the lack of competition may produce adverse effects on cost and progressiveness. F.M. Scherer, *Industrial Market Structure and Economic Performance,* 407–438 (2d ed. 1980).

Since this case cannot be resolved by resorting to economic theory alone, we turn to the factual evidence. The Star and *amicus* contend that the company's proposed forward integration will in fact result in more efficient distribution, lower retail prices and better customer service. The record does not support these claims. Rather, it shows that the anticompetitive consequences of the Star's proposed refusal to deal will likely outweigh any competitive benefits. The refusal will eliminate the Star as a potential competitor in the retail

---

**9.** The Star and *amicus* concede that these anticompetitive effects of vertical integration are theoretically possible but they contend that none are produced by the Star's decision to exclusively sell and deliver its own newspapers. The record does not support this contention. *See infra,* at 329–332.

market, will likely result in higher prices and poorer services to readers, and will not lead to a more efficient delivery system.

The preservation of potential competition in concentrated markets is an important goal of antitrust policy. *See, e.g., United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *United States v. Falstaff Brewing Co.,* 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973); *FTC v. Proctor & Gamble Co.,* 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); *United States v. El Paso Natural Gas Co.,* 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964). The potential competition doctrine's rationale is that the threat of entry by a firm standing at the threshold of a market will likely exercise a restraining influence on pricing and other behavior of existing firms in the market, and that the removal of the threat will adversely affect competition. *See Von Kalinowski, 4 Antitrust Laws and Trade Regulations, supra,* § 19.02[2], at 19–50.9—19–55.

The doctrine is applicable when a potential competitor is positioned on the edge of the market so that existing firms reasonably consider it a potential entrant into the market. *See United States v. Falstaff Brewing Co., supra,* 410 U.S. at 532–533, 93 S.Ct. at 1100–1101. The district court found that the independent carriers reasonably believed that the Star was a potential competitor in the distribution market, that the Star's position on the edge of the market had a retardant effect on retail prices, and that the Star's refusal to sell to the independent carriers would eliminate this retardant effect. There is ample evidence to support these findings.

The independent carrier contracts explicitly permitted the Star to sell newspapers directly to readers within each carrier's territory, allowed the Star to cancel a carrier's contract on four days notice, and required each carrier to maintain for the company a complete list of customers and their addresses. The Star has exercised its contractual right to cancel as a result of a carrier's unsatisfactory performance. Moreover, on one occasion in 1970, the Star, at the request of subscribers, commenced direct delivery to a group of customers at an apartment complex in response to a price increase by an independent carrier. In another instance, in 1974, the Star published in its papers "a note to our readers" that informed them that certain increases in home delivery subscription rates were the result of price increases by independent carriers, not the publisher. The Star concedes that it wanted the independent carriers to set retail prices as low as possible so that circulation, and ultimately advertising revenues, would not decrease due to high prices.

Thus, the Star is plainly positioned on the threshold of the retail market. Moreover, it has communicated to the independent carriers its position as a potential entrant. In May, 1974, the Star wrote to all independent carriers, announcing that "[w]hile it is certainly not now anticipated, it should be recognized that in the future the Star can and may choose to modify or change its circulation system or practices without liability to independent contract carriers." Within a week thereafter, it requested an up-to-date list of all subscribers and two months later, a follow-up request was made. The Star informed the carriers that if they did not provide the information by August 24, 1974, they would be terminated. In March, 1977, shortly after Capital Cities' purchase of the Star, the company again requested an up-to-date subscriber list, and followed up this request by letter of April 11, 1977.

The foregoing evidence establishes that the Star took action to show the independent carriers that the company was prepared to enter the delivery market if they did not keep retail prices down. There can be no doubt on this record that the independent carriers were acutely aware of the Star's presence on the edge of the market, and that they made their pricing and service decisions accordingly. The Star's proposal to directly deliver its newspapers and to eliminate independent carriers would destroy the competitive influence it exerts as a potential entrant into the retail market.

In fact, the anticompetitive effects of the loss of the Star as a potential competitor have already begun to appear. In areas where the Star has implemented direct delivery, many customers are already paying higher retail prices. Prior to the Star's announcement of the change in the delivery system, independent carriers had been charging monthly rates ranging from $3.50 to $6.00 for a full subscription, and from $2.85 to $5.85 for a split subscription. When the Star announced the delivery system change, it also publicized its intention to charge a uniform delivery rate, which would be $6.00 per month for a full subscription and $5.00 per month for a split subscription, effective December 1, 1977. While the Star's proposed rates were lower than some of the independent carriers' prices, the implementation of those uniform rates would have resulted in a price increase for most subscribers. Indeed, the record shows that if the Star had implemented its proposed delivery system and uniform rates in December, 1977, 149,728 readers with full subscriptions would have faced price increases, while only 5,990 full subscribers would have had their rates decreased.[10] The number of split subscription readers that would have faced rate increases under the Star's proposal also exceeded the number that would have paid lower prices.[11] In areas where the Star has replaced independent carriers with delivery agents, many readers are in fact now paying more for their newspapers than they did under the old system. Indeed, at trial, the Star's circulation manager conceded that the price increases have contributed to decreased circulation on some routes.

The Star's efforts to eliminate independent carriers have also resulted in decreased consumer services. The Star publishes twelve or thirteen issues per week. Not all customers want to receive every issue. To satisfy the differing needs of customers on their routes, the independent carriers collectively offer ten different types of split subscriptions, various billing and credit arrangements, and other customer services. Independent carriers also provide service by delivering to racks and to commercial establishments, and by altering their deliveries to these vendors according to vacations, holidays and seasonal variations. Under the existing system, the Star is free to offer another option to anyone dissatisfied with the service provided by his or her carrier. If the independent carriers are eliminated, however, consumers will have only the lim-

10. The independent carriers were asked how many subscribers they served and what price they charged at the time the Star announced its proposal to change delivery systems. Two *hundred and forty-eight carriers responded*, providing the following information:

Full Subscription

| Price | No. of Subscribers |
| --- | --- |
| $3.00 – $3.99 | 854 |
| $4.00 – $4.99 | 25,485 |
| $5.00 – $5.99 | 123,389 |
| $6.00 | 29,285 |
| Over $6.00 | 5,990 |

Split Subscription

| Price | No. of Subscribers |
| --- | --- |
| Under $3.00 | 301 |
| $3.00 – $3.99 | 3,677 |
| $4.00 – $4.99 | 7,905 |
| $5.00 | 2,474 |
| $5.01 – $5.99 | 7,029 |
| Over $6.00 | 49 |

Several of the 248 carriers reported their subscription prices but not the number of subscribers they served:

Full Subscription

| Price | No. of Carriers |
| --- | --- |
| $4.00 – $4.99 | 4 |
| $5.00 – $5.99 | 13 |
| $6.00 | 3 |

Split Subscription

| Price | No. of Carriers |
| --- | --- |
| Under $3.00 | 1 |
| $3.00 – $3.99 | 3 |
| $4.00 – $4.99 | 8 |
| $5.00 | 2 |
| $5.00 – $5.99 | 13 |

11. *Id.*

ited subscription, billing and other services offered by the Star. Any personalized or alternative options provided by independent carriers will be eliminated. Indeed, the Star has already reduced services in certain areas where it placed delivery agents before the district court's order. For example, all delivery agents and independent carriers deliver their newspapers to "city" routes twice per day. Independent carriers with "country" routes also generally deliver the papers both in the morning and in the evening. The Star's agents, however, distribute the newspapers only once a day in "country" routes where they have replaced independent carriers. The Star's justification, according to its circulation manager, is that "we cannot possibly economically deliver it [twice per day] on certain country routes at this particular time."

In addition, the record is devoid of evidence indicating that the Star can deliver its newspapers more efficiently than the independent carriers. In fact, the evidence indicates that the Star intends to increase its profits by increasing retail prices and eliminating the independent carriers' profits rather than reducing delivery costs or increasing circulation through lower prices and/or better services.[12] In this regard, the statements of Capital Cities' officials and employees prior to the purchase of the Star in 1977 are particularly significant. For example, a March 29, 1977, report prepared by John Morton, a securities analyst employed by Capital Cities, stated:

> The two Kansas City newspapers labor under an unwieldy system of distribution by independent distributors, a system that returns to the newspaper far less

revenue per copy than most newspapers enjoy, and the papers in recent years have operated with relatively low margins considering their dominance in the market.

\*　　\*　　\*　　\*　　\*　　\*

There are several aspects of the Kansas City papers that we believe offer Capital Cities considerable opportunity for improvement. The cumbersome distribution system, under which control of prices rests with independent distributors, provides the newspapers with little more than half the circulation revenue than might reasonably be expected from the papers' price. There are lawsuits pending in connection with the distribution setup, and Capital Cities' management declines to comment on what its plans might be. However, it would appear reasonable to expect management to move toward gaining control of distribution along the lines followed by The Los Angeles Times, The Washington Post, and other newspapers that previously had independent distributors. Lawsuits attempting to thwart company takeover of distribution in these markets have resulted in Court decisions in favor of the companies.

At trial, Morton testified that Capital Cities hoped to improve the low circulation revenues by gaining control of the delivery system. He stated:

> A. \* \* \* I do recall at the meeting [of Capital Cities' executives which Morton attended] there was talk of the fact that the revenue per copy was low by industry standards and that they hoped to improve

---

12. The defendant's motivation is relevant because it may reveal the absence or secondary importance of socially beneficial reasons for a vertically integrated monopolist's refusal to deal. Note, *Refusals to Deal by Vertically Integrated Monopolists,* 87 Harv.L.Rev. 1720, 1724 (1979). The district court, while holding the Star's action unlawful, did agree that the company had certain legitimate business reasons for its refusal to deal. It found:

> The new system would give the company control over pricing to the subscriber, thereby being able to advertise subscription prices, which is quite impossible where carri-

ers largely determine the ultimate specific prices. It would permit the company to assure more rapid "starts" for new subscribers, and would allow uniform policy regarding time of collection, manner of payment by customers, and method of responding to customer complaints, all of which have been problems under the independent contract carrier system.

These findings are not clearly erroneous; however, they do not fully summarize the evidence concerning the Star's reasons for proposing to eliminate the independent carriers. *See infra,* at 331–332.

it. There was also talk at some point in the meeting that they hoped to go from independent delivery—they hoped to gain control of the distribution of the newspaper, in other words, as other newspapers were doing at that time.

Q. I think you started to say, "[t]hey hoped to go from independent something to—"

A. Well, to some kind of a system where they would have control over distribution of the newspaper—*the pricing in particular.* [Emphasis added.]

Jim Hale, current president of the Star, prepared a report, dated November 29, 1976, for Capital Cities' president Daniel Burke, which analyzed the Star's operation, including the circulation department and the independent carrier distribution system. Hale stated:

> In synopsis, it is my conclusion that *it will be very difficult to effect major economies in the operation of the Star, and virtually all the profits that we expect to produce there would have to come from additional revenue.* [Emphasis added.]

Thomas Murphy, chairman of the board and chief executive officer of Capital Cities, penciled the note "key to everything" next to the part of Jim Hale's report discussing the publisher's low circulation revenues. At trial, Murphy testified that he expected the Star's revenues from circulation to be increased. He further testified that:

> A. To my knowledge, no decision was made [prior to Capital Cities' purchase of the Star to alter the delivery system].
>
> Q. No decision was made but were there discussions concerning that possible change?
>
> A. As I recall, the only thing—the distribution setup at the Kansas City Star was very unusual, and was not typical of most of the industry. And we certainly would hope over a period of time we could bring it closer to the other type operations that operated more successfully throughout the country.

The testimony of plaintiffs' expert witness, Dr. Frederick Kirby, an economist, corroborates the foregoing statements by the Capital Cities' personnel. Dr. Kirby testified that the $125 million purchase price paid by Capital Cities for the Star could not be justified by the newspaper's existing assets, its past profits, or the previous return on equity enjoyed by Capital Cities' shareholders. He concluded, therefore, that the Star would have to increase its profit level to justify the purchase price. And, Dr. Kirby, like James Hale in his report to Capital Cities, *supra,* at 331, concluded that the Star likely could only improve its profit by increasing revenue rather than reducing costs. He stated:

> There is no economic reason to believe that the Kansas City Star Company will be able to affect distribution of the newspapers more economically than is done by independent businessmen. Therefore, if they incur the same costs as the independent businessmen, then there would be no direct cost savings.

Finally, Dr. Kirby observed that direct delivery would give the Star "maximum control of price," and consequently enable it to increase revenue from both circulation and advertising.

Congress enacted the antitrust laws "to promote competition through the protection of viable, small, locally owned businesses." *Brown Shoe Co. v. United States,* 370 U.S. 294, 344, 82 S.Ct. 1502, 1534, 8 L.Ed.2d 510 (1962). The record here establishes that the Star's proposed action will destroy the present independently owned distributorships, and eliminate any actual and potential competition in the Kansas City retail newspaper market. Moreover, the evidence discussed above shows that the Star's proposed refusal to deal will produce anticompetitive effects on retail prices and services without accomplishing any savings in market transaction costs or creating production economies. The economic theory advanced by the Star and *amicus,* standing alone without factual support in the record, is insufficient to rebut that evidence. Therefore, the district court did not err in finding that the Star's proposed refusal to deal with the independent carriers violates Section 2 of the Sherman Act.

In a number of recent cases, courts have rejected antitrust challenges by former independent distributors to publishers' decisions to vertically integrate into the delivery market. Notwithstanding the record evidence here of the anticompetitive impact and intent of its proposed refusal to deal, the Star contends that these cases compel a reversal of the district court. We disagree.

Some of the cases are inapposite because the alleged unlawful conduct was not the publisher's refusal to deal. For example, in *Newberry v. Washington Post Co.,* 438 F.Supp. 470 (D.D.C.1977), and *Knutson v. Daily Review, Inc.,* 548 F.2d 795 (9th Cir. 1976), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977), the plaintiffs alleged that the publishers and cooperating carriers had unlawfully combined to restrain prices and sales territories. In *Neugebauer v. A.S. Abell Co.,* 474 F.Supp. 1053 (D.Md.1979), the publisher did not refuse to deal with the independent carriers. The plaintiffs, nonetheless, alleged the publisher violated the antitrust laws by increasing the wholesale price of its papers while at the same time expanding its direct distribution activities. The court held that the plaintiffs failed to prove that the defendant had a monopoly in the relevant market and added that, in any event, the publisher's decision to compete with independent carriers was lawful, absent proof of predatory tactics. *Id.* at 1066–1069.

■ Other cases relied on by the Star are distinguishable from the instant one, not because of the legal theories employed by the carriers, but rather because of their factual bases. In several of the cases, the defendant apparently did not possess monopoly power in the relevant market.[13] Consequently, those cases did not involve a monopolist using its dominant market power at one level to eliminate competition and obtain monopoly power at another. It is clear that a monopolist is prohibited from engaging in certain conduct that would be lawful if performed by a competitive firm. *See Berkey Photo, Inc. v. Eastman Kodak Co., supra,* 603 F.2d at 274–275.

Finally, regardless of whether the newspapers enjoyed monopoly power in these refusal to deal cases, *see supra,* at note 13, they are not inconsistent with the district court's judgment here. In each case, the court premised its decision on the finding that the plaintiffs failed to prove that the change in delivery system would produce anticompetitive results.[14] Indeed, each court found that the converse would be true. Accordingly, each gave great weight to the publisher's claim that it was integrating forward because it could deliver the papers more efficiently than independent distributors and it desired to increase circulation by reducing prices and increasing services.

■ In contrast, here the plaintiffs have shown that the Star's refusal to sell its papers to the independent carriers will have an anticompetitive effect. Accordingly, the district court did not err in finding that the Star's proposed refusal to deal with the independent carriers violates Section 2 of

---

**13.** *See Hardin v. Houston Chronicle Publishing Co.,* 434 F.Supp. 54 (S.D.Tex.1977), *aff'd,* 572 F.2d 1106 (5th Cir.1978) (per curiam); *McGuire v. Times Mirror Co.,* 405 F.Supp. 57 (C.D.Cal. 1975); *Lamarca v. Miami Herald Publishing Co.,* 395 F.Supp. 324 (S.D.Fla.), *aff'd without opinion,* 524 F.2d 1230 (5th Cir.1975).

*Knutson v. Daily Review, Inc.,* 548 F.2d 795 (9th Cir.1976), and *Neugebauer v. A.S. Abell Co.,* 474 F.Supp. 1053 (D.Md.1979), are both distinguishable from this case because the defendants did not possess monopoly power in the relevant market, as well as because the plaintiffs did not utilize refusal to deal theories.

**14.** None of the cases relied on by the Star held that vertical integration by a newspaper publisher into the delivery market is lawful regardless of its competitive consequences. Indeed, they suggest quite the contrary. For example, in *Hardin v. Houston Chronicle Publishing Co., supra,* 434 F.Supp. at 57, the court stated: "[t]he change in the method of distribution does not violate the antitrust laws. The new distribution system will not have any anticompetitive effects." The First Circuit in *Auburn News Co. v. Providence Journal Co., supra,* 659 F.2d at 278, also indicated that the publisher's vertical integration would violate the Sherman Act if it had "adverse consequences on competition." The clear implication of the other decision relied on by the Star is the same. *See, supra,* at note 13.

the Sherman Act. None of the cases cited by the Star requires us to reach a contrary conclusion.

## III.

### STANDING.

When this case came before this Court in 1979, we remanded for a determination of the "threshold question * * * [of] whether or not the injury to plaintiffs' businesses that will result to plaintiffs upon termination of the independent distributorship contracts, is a potential injury sufficient to satisfy the first element of a private cause of action [under Section 16 of the Clayton Act, 15 U.S.C. § 26]."[15] *Paschall v. Kansas City Star Co., supra*, 605 F.2d 409. The district court found that the plaintiffs would be damaged as a result of the Star's refusal to deal with them. We agree.

The Star advances two theories why its proposed refusal to deal will not cause plaintiffs "loss or damage" within the meaning of 15 U.S.C. § 26. It first contends that the plaintiffs would not be damaged because it has offered them an opportunity to become delivery agents for the company. Although the record shows that the plaintiffs would most likely receive approximately the same income as delivery agents as they have as independent carriers, this argument remains unpersuasive. Under the existing system of distribution by independent carriers, the plaintiffs own their own routes and can freely transfer or sell them.[16] Consequently, as the district court found and the record establishes, the plaintiffs' routes have significant market value. Indeed, current Star president, James Hale, in his report to the Capital Cities' president prior to the conglomerate's purchase of the newspaper, stated, "[t]he Star does not recognize carrier's proprietary rights but in spite of this, routes are sold at very high figures, ranging up to $200–300,-000."

In contrast, under the proposed new system, the routes would be owned by the Star rather than the carriers; would be for a definite term and terminable in the event of a number of contingencies; and could not be transferred, assigned or sold. Therefore, the new routes would have little, if any, market value to the plaintiffs. This loss in market value plainly is a sufficient showing of damage to the plaintiffs which would result from the proposed change in the Star's delivery system.

The Star, nonetheless, claims that the plaintiffs will not be damaged by the change because, under the new delivery system, they retain the right to distribute other publishers' products. This argument also fails to convince us that the district court erred. As a practical matter, because the Star has a monopoly in the metropolitan daily newspaper market—which it unlawfully attained—the plaintiffs have no adequate substitute for defendant's product. Hence, the plaintiffs' businesses would be less attractive under the new system than the existing one. Moreover, as a legal matter, the fact that the plaintiffs might have other product lines available or other means to generate income does not absolve the Star of antitrust liability for its refusal to deal. *See Trabert & Hoeffer, Inc. v. Piagel Watch Co.*, 633 F.2d 477, 482–483 (7th Cir. 1980).

Thus, we hold that the plaintiffs have established that the Star's refusal to sell newspapers to them will cause them "loss or damage" within the meaning of 15 U.S.C. § 26. Consequently, they have standing to pursue their claim.

## IV.

### INJUNCTIVE RELIEF.

The Star next contends that the permanent injunction entered by the district court

---

**15.** The Clayton Act, 15 U.S.C. § 26, authorizes a private cause of action for injunctive relief against "threatened loss or damage by a violation of the antitrust laws * * *."

**16.** Although under the existing system any change of carriers is subject to the Star's approval, the company concedes that it has regularly approved such changes. Appellees Br. at 38–39, n. 34.

must be vacated because it is overbroad. It argues that by ordering relief beyond requiring the Star to sell newspapers to independent carriers at wholesale rates, the district court unnecessarily intruded into its business operations. There is no merit to these contentions.

**[11]** The district court has both the duty and the authority to fashion relief that terminates the illegal acts of monopolization, that ensures that they do not recur and that eliminates their consequences. *See National Society of Professional Engineers v. United States,* 435 U.S. 679, 697, 98 S.Ct. 1355, 1368, 55 L.Ed.2d 637 (1978); *United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 250, 88 S.Ct. 1496, 1500, 20 L.Ed.2d 562 (1968). Moreover, district courts "are invested with large discretion to model their judgments to fit the exigencies of the particular case." *International Salt Co. v. United States,* 332 U.S. 392, 400–401, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947).

Here, the district court faced a situation where the Star is the sole source of metropolitan daily newspapers. Accordingly, it controls the price and supply of its product. The Star already has unlawfully attempted to eliminate the independent carriers as competitors in the retail market. It likely will continue to compete with the independent carriers in the retail market. In this hostile environment, a simple mandate directing the Star to sell its newspapers to independent carriers at wholesale rates very likely would not preserve competition as the Sherman Act requires.

Therefore, the district court entered a broader permanent injunction. It, of course, ordered the Star to sell its newspapers at wholesale to independent carriers. In addition, it enjoined the defendant from terminating any existing delivery agreements with the plaintiffs except for a material breach of contract. Finally, the district court ordered that if the Star proposes to terminate any independent carrier, it must give him or her written notice of the alleged breach of contract and ten days to comply with the contractual terms without the penalty of termination. If termination

becomes necessary, the defendant must allow the carrier twenty days after the written notice to secure a successor, subject to the Star's approval, which must be given or withheld according to the standards that now prevail.

In light of all the circumstances present here, we cannot say that the relief fashioned by the district court is improper. The district court explicitly provided that its injunction does not "prohibit the defendant from exercising its right to compete with plaintiff and intervenors by selling its newspapers at retail to home subscribers and other customers." Moreover, commentators have recognized that because a monopolist can evade its duty to deal by offering to do business only on unreasonable terms, a court must supervise the price and other terms of dealing to ensure that its decree is effective. *See* Areeda & Turner, 3 *Antitrust Law, supra* at ¶ 729; Note, *Refusals to Deal by Vertically Integrated Monopolists, supra,* 87 Harv.L.Rev. at 1754–1760. The district court's order here is no broader than necessary to provide sufficient supervision to effectively enforce its decree.

The Star, nonetheless, argues that because the order includes provisions to enforce the duty to deal imposed by the district court, it is improper. This argument is simply untenable. The Supreme Court has consistently recognized that "[t]he purpose of relief in an antitrust case is 'so far as practicable, (to) cure the ill effects of the illegal conduct, and assure the public freedom from its continuance.'" *United States v. Glaxo Group Limited,* 410 U.S. 52, 64, 93 S.Ct. 861, 868, 35 L.Ed.2d 104 (1973), *quoting United States v. United States Gypsum Co.,* 340 U.S. 76, 89, 71 S.Ct. 160, 169, 95 L.Ed. 89 (1950). Moreover, in *Otter Tail Power Co. v. United States,* 410 U.S. 366, 381–382, 93 S.Ct. 1022, 1031–1032, 35 L.Ed.2d 359 (1973), the Supreme Court required a vertically integrated monopolist to deal with second-level competitors. The Court obviously was aware that the duty to deal would require supervision; nonetheless, it did not decline to impose that duty. Nor do we in this case. As the *Otter Tail*

*Power* Court stated, "those caught violating the Act must expect some fencing in." *Id.* at 381, 93 S.Ct. at 1031 (citations omitted).

## V.

## AWARD FOR ATTORNEYS' FEES AND COSTS.

After a hearing, the district court awarded the plaintiffs $2.5 million [17] in attorneys' fees, apportioned as follows:

| | | |
|---|---|---|
| 1. | Base fee for time expended after the Star's September 24, 1977, proposed refusal to deal: .................... | $1,045,468.12 |
| 2. | Base fee for time expended prior to September 24, 1977: | $ 56,603.12 |
| 3. | Bonus for risk and quality of representation: ........... | $1,102,071.24 |
| 4. | Paralegal and law clerk time, and fee application: ....... | $ 129,414.37 |
| 5. | Premium: ............... | $ 166,443.15 |

The district court also awarded the plaintiff $342,399.42 in costs: $34,407.14 in stipulated items, plus $307,932.28 for expert witness fees. The Star challenges the district court's award on several grounds.

### A. *Attorneys' Fees Incurred Prior to September 24, 1977.*

■ The Star first contends that none of the time expended by plaintiffs' counsel prior to September 24, 1977—the date the defendant announced its proposal to change distribution systems—should be included in the attorneys' fee award. The district court rejected the Star's claim.

It is true, as the Star contends, that the defendant did not announce its intention to abandon the independent carrier delivery system until September 24, 1977, and that this proposed action constituted the Sherman Act violation against which the district court entered a permanent injunction. Nonetheless, plaintiff Paschall initiated this action in January, 1975, after the following series of acts taken by the Star: In March, 1974, the Star amended its distribution con-

tracts to change wholesale prices from a fixed rate to one based on a percentage of each individual carrier's retail price. Two months later, on May 24, the Star sent a letter to each independent carrier stating that the carriers had no vested property interest in their routes, and declaring that the company could alter its distribution system without liability to them. Shortly thereafter, the Star requested an up-to-date list of subscribers from each independent carrier. Beginning on June 1, the Star required any individual signing a new independent carrier contract to acknowledge in writing that he or she had read and understood the company's May 24 letter.

These events precipitated Paschall's 1975 complaint, which included the Sherman Act claim upon which the Star's liability ultimately was based. Moreover, the acts taken by the Star in 1974 were part of a pattern of conduct in which it demonstrated that it was a potential entrant into the retail market. The Star's antitrust liability here is based, in part, on this potential entrant status. Finally, attorneys for the plaintiffs testified that they spent considerable time prior to 1977 investigating the newspaper business in general and the Star in particular, including, of course, its relationship with its independent carriers. The plaintiffs used the information gained in those pre-1977 investigations to press their case for injunctive relief after the Star announced the proposed change in delivery systems.

Accordingly, we believe that the time expended by plaintiffs' attorneys prior to September 24, 1977, was sufficiently related to their subsequent efforts to gain injunctive relief to justify the district court's decision. Thus, it did not err in awarding attorneys' fees to plaintiffs for work done prior to September 24, 1977.

### B. *Risk and Quality Bonus.*

The Star next contends that the district court erred by adding a bonus to the attor-

---

**17.** This $2.5 million award was for the services provided by the law firm of Morris, Larson, King, Stumper & Bold (Morris firm) which represented virtually all of the independent carriers in this case. The district court also granted

fee awards of $1,830 and $1,500 to two other law firms, each of which nominally represented two carriers. The Star does not challenge the latter two awards on appeal.

neys' fee award beyond the base fee or "lodestar" amount.

In *Jorstad v. IDS Realty Trust*, 643 F.2d 1305, 1312–1313 (8th Cir.1981), this Court noted that the factors to be considered in determining attorneys' fees are:

a) the number of hours spent in various legal activities by the individual attorneys,

b) the *reasonable* hourly rate for the *individual attorneys,*

c) the contingent nature of success, and

d) the quality of the attorneys' work. [Emphasis in original.]

The starting point in determining attorneys' fees is to calculate a base or "lodestar" figure by multiplying a reasonable hourly rate by the number of hours reasonably expended. *Id.* at 1312. The parties stipulated that the reasonable hourly rates for the individual attorneys were the Morris firm's current hourly fees, and the defendant does not challenge the district court's determination of the number of hours spent by plaintiffs' attorneys.[18] The issue on appeal is whether the district court erred in doubling the lodestar figure of $1,102,071.24 (the stipulated upon $1,045,468.12, plus $56,603.12 for pre-September 24, 1977, work) on the basis of the risk (contingency) and quality of the work by plaintiffs' attorneys.

■■■■ The district court is vested with significant discretion in determining a "reasonable fee." *E.g., International Travel Arrangers, Inc. v. Western Airlines, Inc.,* 623 F.2d 1255, 1274 (8th Cir.), *cert. denied,* 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980). Nonetheless, we must find an award improper if "the district court's findings were clearly erroneous as to the factual basis for the award, or * * * it committed abuse as to the discretional margin involved in its allowance." *Id.*

■■■ This Court has recognized that "the moving party must bear a heavy burden in proving the entitlement to an increase for risk or quality * * *." *Jorstad v. IDS Realty Trust, supra,* 643 F.2d at 1314. As the *Jorstad* Court noted, an increase is designed to take account of an unusual degree of risk or skill; it is a bonus that "reflects exceptional services only." *Id., quoting Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 118 (3d Cir.1976). In addition, this Court has frequently cautioned against "over-generosity" caused by the use of high multiples of the lodestar figure. *See, e.g., Jorstad v. IDS Realty Trust, supra,* 643 F.2d at 1314; *International Travel Arrangers, Inc. v. Western Airlines, Inc., supra,* 623 F.2d at 1274. Because the plaintiffs did not meet their burden, we find that the district court abused its discretion in awarding any bonus for risk or quality of representation.

First, the increase awarded represents a doubling of a substantial lodestar amount. This lodestar figure already provides compensation for the length and complexity of the litigation because it included more than 11,000 hours in attorney time that extended as far back as 1973. Moreover, the stipulated hourly rates used to calculate the base fee were the Morris firm's current rates—which are among the highest in the Kansas City area. These rates thus reflect the experience, reputation and quality of plaintiffs' attorneys.

Furthermore, the lodestar figure, by its nature, already includes a substantial enhancing factor: the current rates of the Morris firm were used to calculate the fee award, even though most of the attorney time was incurred much earlier when actual hourly rates were lower. *See Jorstad v. IDS Realty Trust, supra,* 643 F.2d at 1313. Indeed, the stipulated hourly rate for plaintiffs' lead and senior trial counsel were $125 and $110 respectively. If we permitted the

---

**18.** The parties, of course, stipulated to the base attorneys' fee for time expended after September 24, 1977. The Star also does not challenge the district court's determination of the appropriate attorney time expended or hourly rates for the period before that date. Instead, the

Star contends that the plaintiffs are entitled to no compensation for attorneys' fees prior to September 24, 1977, because that work was for matters independent from the instant action. We have already rejected this contention.

district court's bonus and premium to stand, those rates would exceed $250 and $225 per hour.

Finally, the district court's factual findings here simply do not support any further enhancement of the fee award due to the risks involved in this litigation.

In sum, we acknowledge the work done by plaintiffs' attorneys was of high quality, but because we believe that the lodestar award amply compensates plaintiffs' attorneys for the work done, we vacate that portion of the district court's attorneys' fees award which represents a bonus for risk and quality of representation.

### C. *Premium.*

▊ The Star also argues that the district court erred in awarding the plaintiffs a "premium" of $166,332.15 beyond the doubled lodestar amount. We agree with the defendant.

The district court offered no explanation for this "premium." The plaintiffs have not advanced a satisfactory justification that is independent of the rationale given for doubling the lodestar award. Nor can we find any support in the record. It is apparent that the district court added the "premium" to round off the fee award at $2.5 million. Such an addition, without explanation and support in the record, is improper. Accordingly, we also set aside this portion of plaintiffs' recovery for attorneys' fees.

### D. *Expert Witness Fee.*

Finally, the Star appeals from the district court's award of costs for plaintiffs' expert witness fees. The district court awarded $312,932.28 to the plaintiffs for the cost of their experts, Dr. Frederick Kirby and Professor Hal Lister.

The Star first contends that the district court had no authority to award costs for expert witness fees. The rule traditionally followed by federal courts is that such fees cannot be recovered as costs beyond the statutory allowances for attendance, mileage and subsistence provided in 28 U.S.C. § 1821. *E.g., Quy v. Air America, Inc.,* 215 U.S.App.D.C. 181, 667 F.2d 1059, 1066–1068 (1981); *State of Illinois v. Sangamo Construction Co.,* 657 F.2d 855, 866–867 (7th Cir.1981). With increasing frequency, however, federal courts have suggested that the prevailing party may recover expert witness fees when the expert's testimony was crucial to the resolution of the case. *See, e.g., Roberts v. S.S. Kyriakoula D. Lemos,* 651 F.2d 201, 204–206 (3d Cir.1981); *Cagle v. Cox,* 87 F.R.D. 467, 471 (E.D.Va.1980); *Worley v. Massey-Ferguson, Inc.,* 79 F.R.D. 534, 541 (N.D.Miss.1978).

In *Farmer v. Arabian American Oil Co.,* 379 U.S. 227, 235, 85 S.Ct. 411, 416, 13 L.Ed.2d 248 (1964), the Supreme Court indicated that Fed.R.Civ.P. 54 authorizes district judges to award costs not specifically enumerated in 28 U.S.C. § 1821.[19] In *Welsch v. Likins,* 68 F.R.D. 589, 597–598 (D.Minn.1975), the district court, relying on *Farmer v. Arabian American Oil Co., supra,* held that expert witness fees may not be recovered as a matter of course, but a trial court has discretion to award them when "they were particularly necessary under the circumstances of the individual case." This Court affirmed the district court's decision on the basis of the lower court's opinion. *Welsch v. Likins,* 525 F.2d 987 (8th Cir.1975) (per curiam).

▊ The Third Circuit also adopted this approach in *Roberts v. S.S. Kyriakoula D. Lemos, supra,* 651 F.2d at 206. It stated:

---

**19.** *The Supreme Court stated:*

We do not read that Rule [54(d)] as giving district judges unrestrained discretion to tax costs to reimburse a winning litigant for every expense he has seen fit to incur in the conduct of his case. Items proposed by winning parties as costs should always be given careful scrutiny * * *. Therefore the discretion given district judges to tax costs should be sparingly exercised with reference to expenses not specifically allowed by statute. Such a restrained administration of the Rule is in harmony with our national policy of reducing insofar as possible the burdensome cost of litigation.

*Farmer v. Arabian American Oil Co.,* 379 U.S. 227, 235, 85 S.Ct. 411, 416, 13 L.Ed.2d 248 (1964).

A district court should therefore carefully scrutinize the prevailing party's bill of costs in order to assure that any award will compensate only those expenditures necessary to the litigation. While *Farmer* commands perhaps a tight-fisted exercise of discretion in order to insure moderation in the cost of litigation, it does not mandate parsimony to the extent of precluding recovery of legitimate and indispensible litigation expenditures.

We believe that this approach is the proper one. Accordingly, we conclude that the district court here had discretion to award costs to plaintiffs for their expert witness fees.[20]

■ The Star next contends that even if expert witness fees are recoverable in some cases, the district court erred in awarding them here. First, the defendant claims that the court failed to find that the testimony of either expert was "indispensable" or "crucial" to the issues decided below. We agree that a district court must make such a finding, *Welsch v. Likins, supra,* 68 F.R.D. at 596–597; but we believe that the court here has fulfilled that obligation. It stated:

> It seems inequitable and injust to this Court that the enormous expense of the research necessary and the fees of qualified experts to testify, both of which are essential to the plaintiff making a case in a complex antitrust claim such as this one, should not be borne by the defendant when the plaintiff prevails.

This language plainly shows that the district court believed that the testimony of Kirby and Lister was "crucial" or "indispensable" to plaintiffs' case; its failure to use those precise words is of no significance. The district court refused to award costs for expert witnesses who did not testify, even though their work was "undoubtedly most helpful" to plaintiffs' case.

Second, the Star argues that even if the district court utilized the "crucial" or "indispensable" standard, it erred in finding that the testimony of Dr. Kirby satisfied this requirement. We must also reject this argument. Dr. Kirby testified extensively concerning the possible economic impact of defendant's proposed action, including the unlikelihood that it would produce any significant distribution economies or result in lower prices or better service. *See supra,* at 332. As discussed above, the competitive impact of the Star's proposed refusal to deal is the most important issue in this case. Dr. Kirby's research and the evidence that resulted from it were relevant to that issue. Consequently, the district court did not err in permitting the plaintiffs to recover the cost of his fees.

## VI.

### CONCLUSION.

For the foregoing reasons, we hold that the Star's proposed refusal to deal with the independent carriers constitutes a monopolistic practice in violation of Section 2 of the Sherman Act, that it threatens the plaintiffs with sufficient "loss or damage" to satisfy the statutory requirement for a private cause of action for injunctive relief, and that the remedy ordered by the district court is proper. We also hold that the plaintiffs are entitled to the costs and attorneys' fees, except for the bonus for risk and quality of representation and unexplained premium, awarded by the district court. Accordingly, the judgment and order of the district court is affirmed as modified.

HENLEY, Senior Circuit Judge, dissenting.

Because I am convinced that the Star's decision to change its distribution system was based on legitimate business justifica-

**20.** The plaintiffs here did not seek approval from the district court to introduce their expert testimony. Although some courts have found that expert witness fees may be awarded only if the party employing experts has made prior application to tender that testimony, *e.g., Cagle v. Cox,* 87 F.R.D. 467, 471 (E.D.Va.1980), the majority of courts have not required such prior application. *E.g., Roberts v. S.S. Kyriakoula D. Lemos,* 651 F.2d 201, 205–207 (3d Cir.1981); *Welsch v. Likins,* 68 F.R.D. 589, 597–598 (D.Minn.1975), *aff'd,* 525 F.2d 987 (8th Cir. 1975) (per curiam). We also decline to adopt a prior approval requirement.

tions and produced no unreasonable anticompetitive effects, I respectfully dissent.

Although I am not in basic disagreement with much of the majority's statement of the law, I think it is important to remember that monopolies are not prohibited from making legitimate business decisions,[1] and that it is only those decisions which result in *unreasonable* anticompetitive effects that are condemned. *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843, 860 (6th Cir.1980); *Mid-Texas Communications Systems, Inc. v. American Telephone and Telegraph Co.*, 615 F.2d 1372, 1388–89 (5th Cir.), *cert. denied*, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980). The district court found, and the majority agrees, that the change from an independent carrier to an agency distribution system was based on legitimate business reasons. Nevertheless, the district court concluded that defendant was in violation of § 2 of the Sherman Act based on the following findings: that the Star was a potential competitor of the independent carriers; that the resulting competitive tension had a retardant effect on retail prices; and that the elimination of that retardant effect by the Star's vertical integration had an anticompetitive effect on the relevant metropolitan daily newspaper market.

I have some doubt as to the validity of characterizing defendant as a potential competitor, *cf. Universal Life Distributors, Inc. v. Northwest Industries, Inc.*, 452 F.Supp. 1206, 1219–24 (D.Md.1978), *aff'd in pertinent part*, 602 F.2d 1173 (4th Cir.1979) (manufacturer that made isolated de minimis sales in exclusive territory of distributor was not a competitor), and as to the significance of any retardant effect on prices resulting from defendant's "hovering presence" on the fringe of the retail market,[2] *cf. United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 531–32, 93 S.Ct. 1096, 1100, 35 L.Ed.2d 475 (1973) ("Suspect also is acquisition by a company . . . so situated as to be a potential competitor and likely to exercise *substantial* influence on market behavior." (emphasis added)), but I will accept these findings for present purposes. I am more troubled with the district court's finding that the elimination of this possible retardant effect had an unreasonable anticompetitive impact on the market.

The district court's concern with the loss of this negligible price retardant influence might have been alleviated had it given weight to the recognized retardant effect of the economic theory of optimum monopoly price, as described by the majority, *supra* at 328. I realize, however, as does the majority, that vertical integration by a monopoly can have anticompetitive effects.[3] Three situations have been identified as counteracting the theory of optimum monopoly price, thus making it potentially profitable for a monopolist to integrate forward even if it is less efficient than those it replaces: (1) where integration allows price discrimination, (2) where integration erects barriers to first-level entry, and (3) where integration permits evasion of regulation of first-level monopoly profits. *Byars v. Bluff City News Co., Inc.*, 609 F.2d at 861.

---

1. "[S]ince we tolerate the existence of some monopolists, we must give them some leeway in making business decisions." *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843, 862 (6th Cir.1980).

2. These findings are based in part on evidence that the Star reserved the rights to sell directly to customers and to cancel independent carrier contracts on four days notice. As noted by the district court, however, the evidence suggests that in one year the Star sold directly to only about 200 customers out of a total circulation of about 330,000. It was also observed that the Star "exercised the right to sell direct, . . . only once, probably, against the wishes of the carriers."

3. It has been suggested that one of the factors to consider in determining the consequences of vertical integration is the degree of competition between the two levels. Note, *Refusals to Deal by Vertically Integrated Monopolists*, 87 Harv. L.Rev. 1720, 1726 (1974). That is, the higher the degree of competition between the two levels, the lesser the benefit to be anticipated by vertical integration. Given the minimum degree of competition, or potential competition, between the Star and the independent carriers, one might expect little by way of adverse effect of forward integration.

The majority found no record support for the contention by the Star and amicus that none of these anticompetitive situations exist in the present case. It is to be noted, however, that the burden is not on defendant to prove the absence of anticompetitive effects, but rather it is plaintiff's responsibility to prove all the elements of an antitrust violation, as the majority seems to acknowledge, *supra* at 327. *See Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 858 (9th Cir.1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). I do not think this burden has been met. Furthermore, with respect to the Star's contention, I interpret the record somewhat differently than do my brothers. First, there is little danger that a change to an agency distribution system will result in price discrimination because one of the primary purposes of the new system is to permit the establishment and advertisement of uniform prices.[4] As for barriers to first-level entry, the district court found that the new distribution system "would not be likely to make a difference to ... future daily metropolitan newspapers."[5] Finally, it is not suggested that the Star is attempting to evade governmental price regulation.

To further aid in analyzing the antitrust implications of a monopoly's vertical integration, the Sixth Circuit, in *Byars v. Bluff City News Co., Inc., supra,* listed several factors to consider. The first two factors, efficiency and the existence of legitimate business reasons, weigh in favor of defendant. The independent carrier system was described in the statements of Capital Cities' officials, quoted by the majority *supra* at 331, as "unwieldy" and "cumbersome." The district court found, and

the majority does not disagree, that the Star had legitimate business reasons for its decision which included such efficiency considerations as the assurance of more rapid "starts" for new subscribers, and the establishment of uniform policies regarding collection, payments, and customer complaints, all of which were recognized by the district court as problems under the independent dealer system. *See* majority opinion *supra* at 331 n. 12.

The court in *Byars* placed special emphasis on the third factor, a showing of predatory acts. 609 F.2d at 863. There is no evidence of "dirty tricks" in the present case. *See Knutson v. Daily Review, Inc.,* 548 F.2d 795, 803 (9th Cir.1976), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977) (exercise of contractual right of termination "can hardly be deemed 'unfair'"). On the contrary, it seems that the Star acted in good faith by offering the independent carriers the opportunity to negotiate non-exclusive agency contracts providing a comparable income.

The majority attempts to bolster the district court's finding of anticompetitive effects by referring to specific evidence in the record which, it is asserted, indicates that the implementation of the new system will result in higher prices and fewer subscription alternatives. We are not told to what extent, if any, higher prices might be necessitated by general economic conditions, regardless of the distribution method. Moreover, the record indicates that the majority of subscribers paid between $5.00 and $6.00 for a full subscription and between $4.00 and $6.00 for a split subscription, with rates on some routes ranging as high as $6.75 for a full and more than $6.00 for a split sub-

---

4. The fact that the Star would have control over the price is not by itself a violation of antitrust law. *Hardin v. Houston Chronicle Publishing Co.,* 434 F.Supp. 54, 57 (S.D.Tex. 1977), *aff'd,* 572 F.2d 1106 (5th Cir.1978).

5. A survey of cases reveals the emphasis placed on finding a barrier to first-level entry. *See, e.g., Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (monopoly power company not only refused to sell wholesale to some municipalities but also refused access to other wholesale

sources); *Eastman Kodak Co. of New York v. Southern Photo Materials Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927) (monopolist manufacturer prohibited dealers from handling competitive goods); *Knutson v. Daily Review, Inc.,* 548 F.2d 795, 803 (9th Cir.1976), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977) (elimination of competitor unreasonable where manufacturer's market power enhanced and ability of other manufacturers to compete diminished).

scription. Thus, the Star's rates of $6.00 for a full and $5.00 for a split subscription appear to be well within the range of rates charged by the independent carriers. As for the number of subscription options, the majority refers to evidence that the independent carriers collectively offer ten alternatives, but it is not clear how many options are available to the customers on various individual routes or how many options are offered by the Star.

I do not disagree that some customers may pay a somewhat higher price and that some customers might have fewer options. On the other hand, it appears that some customers will pay lower rates and might have more alternatives from which to choose. The imposition of a slightly higher price and the possible diminution of options for some customers are outweighed, in my view, by the benefits to the customers of uniform prices and services, and do not amount to unreasonable anticompetitive effects.

Although to some extent each case must be judged on its facts, *Auburn News Co., Inc. v. Providence Journal Co.,* 659 F.2d 273, 278 (1st Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982), a survey of relevant cases indicates that the

decision of the Star to terminate the contracts of the independent carriers is not in violation of antitrust law. It has been observed that "[c]ourts have uniformly refused to enjoin newspaper publishers from changing, for valid business reasons, their systems of distribution from that of independent distributors to direct sales." [6] *Hardin v. Houston Chronicle Publishing Co.,* 434 F.Supp. 54, 57 (S.D.Tex.1977), *aff'd,* 572 F.2d 1106 (1978), and cases cited therein. This appears to be true whether or not the newspaper in question is a monopoly. *See, e.g., Auburn News Co., Inc. v. Providence Journal Co., supra; Newberry v. Washington Post Co.,* 438 F.Supp. 470 (D.D.C. 1977); *Grill v. Reno Newspapers,* 6 Media L.Rep. (BNA) 1818 (D.Nev.1980).[7]

No inference that a business decision to modify distribution enjoys an absolute immunity from antitrust ramifications should be drawn. However, the application of the well-reasoned analysis in *Byars v. Bluff City News Co., Inc., supra,* leads to the conclusion that the Star's decision was justified by legitimate business reasons, produced no unreasonable anticompetitive effects, and therefore was not in violation of § 2 of the Sherman Act.[8] The effect of invoking

**6.** Industry practice may be considered when analyzing a monopolist's conduct. *See Mid-Texas Communications Systems, Inc. v. American Telephone and Telegraph Co.,* 615 F.2d at 1388–89, *citing Union Leader Corp. v. Newspapers of New England, Inc.,* 180 F.Supp. 125 (D.Mass.1959), *modified,* 284 F.2d 582 (1st Cir. 1960).

**7.** The majority correctly notes, *supra* at 327 n. 8, that the court in *Auburn News* found no antitrust violation because there was no reduction of competition in the delivery market. The court's conclusion was based on the finding that independent dealers operated in exclusive territories, as in this case, and did not compete with one another. It is not clear from the opinion in *Auburn News* whether the newspaper publisher retained the right, under its independent dealer distribution system, to sell directly to consumers. Common sense suggests, however, that such a reservation would be advisable to protect the publisher by allowing direct sales in certain circumstances, for example at the request of an independent dealer or when a dealer fails to deliver to its subscribers.

The majority also finds *Newberry* inapposite as not involving an alleged refusal to deal. *See supra* at 333. The court in that case, however, discussed the antitrust ramifications of the change in distribution system and, in finding no violation, stated "[a] dealer system imposed by this Court would amount to undue interference with the seller's right to fashion the manner in which he chooses to sell his own product." 438 F.Supp. at 485.

**8.** The present case can be distinguished from the following cases in which antitrust violations were found. In *Otter Tail Power Co. v. United States, supra,* a monopoly power company's refusal to sell wholesale to certain municipalities or to "wheel" power from other wholesalers resulted in evasion of first-level profit regulation and erected barriers to first-level entry by other wholesalers. In addition, the company apparently initiated a program of harassing litigation to protect its monopoly position. In *Eastman Kodak Co. of New York v. Southern Photo Materials Co., supra,* the Court, although focusing on the issue of monopolistic intent, noted the absence of business justifications for defendant's refusal to deal.

the Sherman Act in this case serves not to protect competition, which was found to be de minimis, nor to protect the consumers, but to protect the market value of the independent carrier routes by prohibiting the Star from exercising its bargained-for contractual right of termination, a result which, in my opinion, is not contemplated by the Act. *Cf. Auburn News Co. v. Providence Journal Co.,* 659 F.2d at 278 (Sherman Act not violated by vertical integration even though distributors could not remain in business).

I would therefore reverse the district court's finding of an antitrust violation and refuse to award costs or attorney fees.[9]

273 U.S. at 375, 47 S.Ct. at 404. Similarly, in *Poster Exchange, Inc. v. National Screen Service Corp.,* 431 F.2d 334 (5th Cir.1970), *cert. denied,* 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811 (1971), a monopoly producer and national distributor of motion picture advertising accessories refused to deal with a local distributor. The district court's finding of an antitrust violation was held to be supported by the absence of

sound business reasons and defendant's "grossly predatory practices." *Id.* at 340–41.

**9.** Given the overall result reached by the majority the award of attorney fees is appropriate. However, I would adhere to the traditional American rule, *supra* at 338, and disallow expert witness fees over and above the statutory allowances provided in 28 U.S.C. § 1821.